IN THE SUPREME COURT OF NORTH CAROLINA

No. 174PA21

Filed 23 August 2024

STATE OF NORTH CAROLINA

v.

PHILLIP BRANDON DAW

On discretionary review pursuant to N.C.G.S. § 7A-31 of a unanimous decision of the Court of Appeals, 277 N.C. App. 240 (2021), affirming an order entered 15 June 2020 by Judge Craig Croom in Superior Court, Wake County, summarily denying defendant's application for writ of habeas corpus. Heard in the Supreme Court on 13 February 2024.

*Joshua H. Stein, Attorney General, by Heidi M. Williams, Assistant Attorney General, for the State-appellant.*

*W. Rob Heroy for defendant-appellee.*

*Daniel K. Siegel and Ivy Johnson for American Civil Liberties Union of North Carolina Legal Foundation, North Carolina Advocates for Justice, Disability Rights North Carolina, and the Cato Institute, amici curiae.*

BERGER, Justice.

Petitioner Phillip Brandon Daw was sentenced to multiple consecutive terms of imprisonment in the fall of 2019. On 15 June 2020, Daw filed a petition for writ of habeas corpus alleging that he was "unlawfully and illegally detained" because the North Carolina Department of Public Safety was "incapable of ensuring that [he

would] not be exposed to COVID-19." According to petitioner, his continued confinement violated the Eighth Amendment to the United States Constitution and Article I, Section 27 of the North Carolina Constitution. The trial court denied petitioner's request, and the Court of Appeals affirmed, but we allowed discretionary review to determine whether the decision below altered the plain language of our habeas corpus statutes. We modify and affirm the decision of the Court of Appeals for the reasons set forth herein.

## I.  Factual and Procedural Background

Petitioner pleaded guilty and was found guilty of multiple counts of obtaining property by false pretenses in September and November 2019. He was ultimately sentenced to a total prison term of between forty-one and 107 months for these convictions.

On 15 June 2020, petitioner filed an application for writ of habeas corpus in the Superior Court, Wake County, arguing that he was "unlawfully and illegally detained" and that his continued incarceration violated the Eighth Amendment to the United States Constitution and Article I, Section 27 of the North Carolina Constitution. According to petitioner, the potential viral spread of COVID-19 within the correctional institution, combined with petitioner's medical history and condition, rendered his continued confinement cruel and/or unusual. Petitioner's application did not contest the competency of the trial court's criminal jurisdiction. Instead, petitioner relied on a Court of Appeals opinion, *State v. Leach*, 227 N.C. App. 399

(2013), to argue that competent jurisdiction did not compel summary denial of his application for habeas relief.

The trial court denied the application that same day, noting that N.C.G.S. § 17-4(2) requires that "[a] petition for a writ of habeas corpus shall be denied where a person is held pursuant to a valid final judgment in a criminal case entered by a court with proper jurisdiction," and that petitioner's "judgments are valid final judgments entered by a court with proper jurisdiction." Petitioner sought certiorari from the Court of Appeals, and his petition for writ of certiorari was allowed on 9 July 2020.

The Court of Appeals heard oral argument in this matter on 9 February 2021, but petitioner was released from prison six days later under the Department of Public Safety's Extended Limits of Confinement Program. *State v. Daw*, 277 N.C. App. 240, 243 (2021). The Court of Appeals acknowledged that because petitioner had "received the relief requested in his petition . . . this case is moot," *id.* at 244, but nevertheless held that "the public interest exception to the mootness doctrine applie[d]" and proceeded to the merits of the case, *id.* at 245. The Court of Appeals repudiated the trial court's basis for its decision, holding that the discharge provision in N.C.G.S. § 17-33(2) provided an exception to the plain language of N.C.G.S. § 17-4(2). *Id.* at 260. Nevertheless, the Court of Appeals affirmed the trial court's summary denial on the basis that petitioner's application "did not demonstrate . . . colorable claims for violations of his rights." *Id.* at 269.

This Court allowed the State's petition for discretionary review on 3 March

2023 to determine whether the Court of Appeals erred in holding that subsection 17-33(2) provides an exception to subsection 17-4(2). As this question involves issues of statutory interpretation, we review the decision of the Court of Appeals de novo. *Morris v. Rodeberg*, 385 N.C. 405, 409 (2023).

## II. Analysis

### A. Mootness

Our State Constitution provides that "[t]he Supreme Court shall have jurisdiction to review upon appeal any decision of the courts below, upon any matter of law or legal inference." N.C. Const. art. IV, § 12. In addition, the General Assembly has provided that this Court has "jurisdiction to review upon appeal decisions of the several courts of the General Court of Justice and of administrative agencies, upon matters of law or legal inference." N.C.G.S. § 7A-26 (2023). "While the federal constitution limits the federal 'Judicial Power' to certain 'Cases' and 'Controversies.' U.S. Const. Art. III, § 2, our Constitution, in contrast, has no such case or controversy limitation to the 'judicial power.' " *Comm. to Elect Dan Forest v. Emps. Pol. Action Comm.*, 376 N.C. 558, 591 (2021).

"A case is moot when a determination is sought on a matter which, when rendered, cannot have any practical effect on the existing controversy." *Chavez v. McFadden*, 374 N.C. 458, 467 (2020) (cleaned up). While this Court generally "do[es] not decide moot cases," *id.*, resolution of an underlying issue does not deprive this Court of jurisdiction where there remains an unresolved matter of law.

For example, the public interest exception applies where "[e]ven if moot," the case implicates "a question that involves a matter of public interest, is of general importance, and deserves prompt resolution." *N.C. State Bar v. Randolph*, 325 N.C. 699, 701 (1989) (per curiam); *see also Harper v. Hall*, 383 N.C. 89, 113–14 (2022) (denying a party's request "to dismiss their own appeal in order to avoid a ruling by this Court" because "th[e] issue is of great significance to the jurisprudence of our state and is squarely and properly before this Court"), *reh'g allowed*, 384 N.C. 1, *and opinion withdrawn and superseded on other grounds on reh'g*, 384 N.C. 292 (2023).

Here, both parties agree that this case is moot. But petitioner now asks this Court to refrain from invoking the same public interest exception relied upon by the Court of Appeals in reaching this issue. Petitioner contends that "[b]ecause the [p]andemic is over, there is no need for this Court to exercise its discretion to unsettle the Court of Appeals['] decision."

But the mootness doctrine is not a shield which prevents this Court from engaging in meaningful review of decisions from the Court of Appeals that, if left undisturbed, would be contrary to established law. First, although the Court of Appeals' decision to proceed to the merits may have been influenced by COVID-19, its expansive interpretation of this State's habeas corpus statutes was not limited to the COVID-19 context. Second, because the Court of Appeals chose to issue a published opinion in this matter, its interpretation of these statutes is not limited to this singular case; rather, the decision below has precedential effect and is binding

on other Court of Appeals' panels and all trial courts in this State. Finally, because the decision below relied on prior decisions of the Court of Appeals interpreting the habeas corpus statutes, dismissing this case and vacating the decision below would not resolve the tension that exists between the plain language of these statutes and the Court of Appeals' interpretation of the same.[1]

For more than five centuries, the writ of habeas corpus has served an essential function of providing relief for those unlawfully restrained of their liberty. *See generally* Dallin H. Oaks, *Legal History in the High Court—Habeas Corpus*, 64 Mich. L. Rev. 451, 459–61 (1966). The writ predates the founding of this State and has been enshrined in our Constitution from the outset. Its function and the procedures under which it may issue are therefore matters of public interest, of general importance, and of great significance to the jurisprudence of this state. Questions regarding these topics, especially those involving direct conflict between decisions of the Court of Appeals and established law, must be resolved, and we therefore proceed to the merits.

## B. Habeas Corpus

### 1. The Writ's Origin and Development

Our founding fathers understood that "the practice of arbitrary imprisonments, have been, in all ages, the favorite and most formidable instruments

---

[1] While our dissenting colleagues take a different view of the public interest exception in this case, we note an evolving attitude towards mooted decisions of the Court of Appeals. *See Brewer v. Rent-A-Center*, 385 N.C. 853, 853 (2024).

of tyranny," and that the writ of habeas corpus was "a remedy for this fatal evil." *The Federalist* No. 84 (Alexander Hamilton). Thus, the writ was enshrined as a fundamental protection of individual liberty against government abuse by the ratification of the United States Constitution. *See* U.S. Const. art. I, § 9, cl. 2 ("The Privilege of the Writ of Habeas Corpus shall not be suspended, unless when in Cases of Rebellion or Invasion the public Safety may require it.").

The Supreme Court of the United States initially recognized the writ's historically limited function such that "[a] perceived error in the judgment or proceedings, under and by virtue of which the party is imprisoned, constituted no ground for relief," and that "a habeas court could examine only the power and authority of the court to act," i.e., the court's jurisdiction, "not the correctness of its conclusions." *Brown v. Davenport*, 142 S. Ct. 1510, 1521 (2022) (cleaned up). But over time, "federal habeas practice began to take on a very different shape," *id.* at 1521, and "[t]he traditional distinction between jurisdictional defects and mere errors in adjudication no longer restrained federal habeas courts," resulting in "an exploding caseload of habeas petitions from state prisoners," *id.* at 1522, that left the Supreme Court struggling to "devis[e] new rules aimed at separating the meritorious needles from the growing haystack," *id.* at 1523.

But the writ in the federal system, shaped by federal statutes and decisions of the Supreme Court of the United States, is largely irrelevant to our consideration of the writ's function within North Carolina. *See Holmes v. Moore*, 384 N.C. 426, 437

(2023) ("[I]t is the duty of the Supreme Court of North Carolina alone to declare what the law is under our Constitution." (citing *Bayard v. Singleton*, 1 N.C. 5 (1787))). Unlike in the federal system, on the state level "the privilege of the writ of habeas corpus was transmitted into American law principally through tradition and the common law" as "[o]nly three of the twelve original states that had written constitutions in the first decade of our national existence included any mention of the writ." Dallin H. Oaks, *Habeas Corpus in the States: 1776–1865*, 32 U. Chi. L. Rev. 243, 247 (1965). One of those three states was North Carolina, with our 1776 Constitution providing that "every freeman, restrained of his liberty, is entitled to a remedy, to inquire into the lawfulness thereof, and to remove the same, if unlawful; and that such remedy ought not to be denied or delayed." N.C. Const. of 1776, Declaration of Rights § XIII.

North Carolina's constitutional provision was initially enforced through our courts' common law authority, with the first legislative action on the subject arriving in 1836. *See* An Act For the Better Security of Personal Liberty, ch. 55, 1 N.C. Rev. Stat. 314 (1836–37). Like "[v]irtually all American habeas corpus legislation," this Act "had its genesis in the English Habeas Corpus Act of 1679," which made the writ accessible "to persons who were committed or detained for criminal or supposed criminal matters." Oaks, *Habeas Corpus*, 32 U. Chi. L. Rev. at 251–52. North Carolina's 1836 Act generally codified the English Habeas Corpus Act of 1679, prohibiting issuance of the writ to "persons convicted, or in execution by legal

process." 1 N.C. Rev. Stat. at 315, § 1.

The 1836 Act also extended the availability of the writ beyond the scope of criminal matters. Specifically, the Act provided:

> When any person shall be imprisoned or otherwise restrained of his liberty, for any other cause than the commission of a criminal offence, unless he shall have been committed in execution upon some legal civil process, or upon some mesne process in a civil action, on which he was liable to be arrested and imprisoned, and on which excessive and unreasonable bail shall not have been required, such person shall be entitled, on application by himself or any person in his behalf, and upon its appearing by affidavit that there is a reasonable ground for the complaint, to the same remedy by writ of habeas corpus . . . .

1 N.C. Rev. Stat. at 317, § 10.

Thus, the 1836 Act followed in the historical footsteps of both the common law and the English Habeas Corpus Act of 1679 by ensuring that "a prisoner [who] was held by a valid warrant or pursuant to the execution or judgment of a proper court . . . could not obtain release by habeas corpus." Oaks, *Habeas Corpus*, 32 U. Chi. L. Rev. at 245. The legislature emphasized this principle again in 1854, mandating that upon habeas review a prisoner who "is condemned by judgment given against him, and held in custody by virtue of an execution issued against him, . . . shall not be let to bail, but shall be presently remanded, where he shall remain until discharged in due course of law." N.C. Rev. Code, ch. 31, § 111 (1854).[2]

---

[2] In the habeas context, "remand" is the return of a petitioner to confinement and "discharge" is release from such confinement. *See* N.C.G.S. §§ 17-33 to -34 (2023).

## 2. *The Writ Today*

In 1868, the people of North Carolina ratified a new Constitution which retained the prior guarantee of the writ and expressly provided that "[t]he privilege of the writ of habeas corpus shall not be suspended." N.C. Const. of 1868, Declaration of Rights § 21; *see also id.* § 18. The legislature also enacted a more comprehensive statutory scheme governing the writ's procedures that remains in force today as Chapter 17 of the General Statutes, with only minor changes made in the intervening years.

Chapter 17 provides that the writ may be prosecuted, or applied for, by "[e]very person imprisoned or restrained of his liberty within this State, for any criminal or supposed criminal matter, or on any pretense whatsoever, *except* in cases specified in G.S. 17-4." N.C.G.S. § 17-3 (2023) (emphasis added). This provision thus sets forth a general rule and an exception; application of the writ is available to any person restrained of their liberty regardless of whether such restraint resulted from a criminal or civil matter, unless the restraint stems from those instances specified in section 17-4. *See id.*; *see also* 1 N.C. Rev. Stat. at 315, § 1 (permitting application for the writ by any person "committed or . . . detained for any crime . . . other than persons convicted, or in execution by legal process"); 1 N.C. Rev. Stat. at 317, § 10 (providing that the writ is available in noncriminal matters, unless the person was "committed in execution upon some legal civil process").

To determine whether the initial hurdle of allowing an application for the writ

of habeas corpus has been met, judges must first look to section 17-4, which provides

that:

> Application to prosecute the writ shall be denied in the following cases:
>
> (1) Where the persons are committed or detained by virtue of process issued by a court of the United States, or a judge thereof, in cases where such courts or judges have exclusive jurisdiction under the laws of the United States, or have acquired exclusive jurisdiction by the commencement of suits in such courts.
>
> (2) Where persons are committed or detained by virtue of the final order, judgment or decree of a competent tribunal of civil or criminal jurisdiction, or by virtue of an execution issued upon such final order, judgment or decree.
>
> (3) Where any person has willfully neglected, for the space of two whole sessions after his imprisonment, to apply for the writ to the superior court of the county in which he may be imprisoned, such person shall not have a habeas corpus in vacation time for his enlargement.
>
> (4) Where no probable ground for relief is shown in the application.

N.C.G.S. § 17-4 (2023).

This provision mandates summary denial of an application to prosecute the

writ when the applicant is, among other things, imprisoned due to a final judgment

or order of a court possessing jurisdiction over the matter, regardless of whether the

matter is criminal or civil in nature. *Id.*; *see also* 1 N.C. Rev. Stat. at 315, 317, §§ 1,

10. When read in conjunction with section 17-3, the law is clear. Every person

imprisoned in this State, regardless of whether such imprisonment stems from a

criminal or civil matter, may apply for the writ of habeas corpus.

But section 17-4 serves a gatekeeping function and limits further consideration of the writ's issuance. N.C.G.S. § 17-4; *see also* N.C.G.S. § 17-9 (2023) (stating that the writ shall be granted without delay unless the application or documents attached thereto show the individual is "prohibited from prosecuting the writ").  Thus, the writ of habeas corpus is expressly not available in this State to persons "detained by virtue of the final order, judgment or decree of a competent tribunal of civil or criminal jurisdiction." *Ledford v. Emerson*, 143 N.C. 527, 536 (1906); *see also* N.C.G.S. § 17-4(2).

### 3. *The Court of Appeals' Decision*

Petitioner here never asserted that his detention was unlawful for a jurisdictional defect, and because he was detained by virtue of the final judgments of a competent court of criminal jurisdiction, the trial court correctly relied on section 17-4 when it summarily denied petitioner's application for the writ of habeas corpus. The Court of Appeals, however, went further; even though inquiry into the availability of habeas relief should have ended with the plain language of section 17-4, it entertained petitioner's argument that the conditions associated with his confinement entitled him to habeas relief.  This was error.

When interpreting a statute, "it must be presumed that the means employed by the Legislature to express its will are adequate to the purpose and do express that will correctly." *State v. Barco*, 150 N.C. 792, 796 (1909) (cleaned up).  It should go

without saying that we may not "interpret what has no need of interpretation and, when the words have a definite and precise meaning, [we cannot] go elsewhere in search of conjecture in order to restrict or extend the meaning." *Id.* (cleaned up).

The Court of Appeals violated these basic tenets of statutory construction by ignoring the plain and definite language of section 17-4. *See also* N.C.G.S. § 17-9. North Carolina's habeas statutes require denial of a habeas application where the applicant is detained by virtue of a final judgment entered by a court of competent jurisdiction, as petitioner was here.[3] By "interpret[ing] what has no need of interpretation" and "go[ing] elsewhere in search of conjecture in order to restrict" or eliminate the applicability of section 17-4, *Barco*, 150 N.C. at 796 (cleaned up), the Court of Appeals judicially rewrote Chapter 17.

Both petitioner and our dissenting colleague rely on section 17-33 to support their contention that section 17-4 does not mean what it plainly says but instead silently establishes a "general rule" subject to exceptions. The relevant portion of section 17-33 provides that "if it appears on the return to the writ that the party is in custody by virtue of *civil process* from any court legally constituted, . . . such party can be discharged only" in one of six circumstances.[4] N.C.G.S. § 17-33 (2023)

---

[3] Our dissenting colleague criticizes us for transforming section 17-4 from a "gatekeeper" into a "gate closer." One wonders at the notion of a gatekeeper that allows entry to all. The role of a gatekeeper, even in the legal context, is to allow passage only for those permitted to enter and to keep out all others—precisely how section 17-4 operates.

[4] Petitioner's argument for habeas relief is rooted in subsection 17-33(2). But he has not argued that there is no legal cause for his detention under the first sentence of that subsection. By its plain terms, the remainder of that subsection applies to those in custody

(emphasis added). One of these circumstances is "[w]here, though the original imprisonment was lawful, yet by some act, omission or event, which has taken place afterwards, the party has become entitled to be discharged." *Id.* § 17-33(2).

Here, because petitioner was "detained by virtue of the final order, judgment or decree of a competent tribunal of civil or criminal jurisdiction," *id.* § 17-4(2), and therefore was not "in custody by virtue of civil process," *id.* § 17-33, section 17-33 is inapplicable in this matter.[5] However, contrary to these provisions' plain language, the Court of Appeals held, and our dissenting colleague insists, that "§ 17-33(2)

---

by virtue of civil process. Even though our dissenting colleague insists that her dissent is in defense of textualism, she acknowledges that the phrase "civil process" does not apply to criminal defendants and is therefore forced to judicially craft a new argument for petitioner under the first sentence of section 17-33. Her discussion is misleading and particularly irresponsible given the clear and unambiguous language at issue. Rather than focus on the text, a fundamental tenet of textualism, she apparently wants to create a new avenue to post-conviction relief for those barred by the legislature from applying for a writ of habeas corpus. Ignoring the fact that making law is not a proper function of the judiciary, our dissenting colleague's atextual approach is especially egregious as post-conviction review is already independently available through a motion for appropriate relief or federal habeas review.

     We also note that our colleague's "exaggerated, hyperbolic dissent," *Walker v. Wake Cty. Sheriff's Dept.*, 385 N.C. 300, 301 (2023) (Dietz, J., concurring), provides ample opportunities to respond in kind, but we decline the invitation to engage in further reductive discourse. It is sufficient to reiterate that because section 17-33 becomes operative only after a writ of habeas corpus has been issued and returned, it is irrelevant to section 17-4's provisions governing *application* for issuance of the writ.

     [5] The Court of Appeals' interpretation of the phrase "civil process" is simply untenable. Changing the meaning of the phrase "civil process" to include criminal convictions requires us to insert words into a statute, *see In re B.O.A.*, 372 N.C. 372, 380 (2019), otherwise "extend the meaning" of words actually used, *Barco*, 150 N.C. at 796, and presume that the legislature was incapable of stating the phrase "civil or criminal" when it intended to communicate that meaning. The plain language of Chapter 17 demonstrates precisely the opposite. *See* N.C.G.S. § 17-4(2) (providing that habeas application must be denied when the applicant is "detained by virtue of the final order, judgment or decree of a competent tribunal of *civil or criminal* jurisdiction." (emphasis added)); *id.* § 17-34(2) (2023) (same).

provides an exception to the general rule provided by § 17-4(2)." *Daw*, 277 N.C. App. at 260. The Court of Appeals reached this conclusion because subsection 17-4(2)

> appears to require summary denial of a petition where a party is "committed or detained by virtue of the final order, judgment or decree of a competent tribunal of civil or criminal jurisdiction," when remand would be required, while § 17-33 requires discharge rather than remand if, "though the original imprisonment was lawful, yet by some act, omission or event, which has taken place afterwards, the party has become entitled to be discharged[.]" Reading § 17-4 without reference to § 17-33 could lead a court reviewing a habeas petition to *mistakenly conclude* that a party "committed or detained by virtue of the final order, judgment or decree of a competent tribunal of civil or criminal jurisdiction" was "prohibited from prosecuting the writ," resulting in summary denial of the petition without resolving whether because of "some act, omission or event, . . . the party has become entitled to be discharged[.]"

*Id.* at 259 (cleaned up) (emphasis added).

This reasoning disregards the statutes' plain language and fundamentally misunderstands their operation. When interpreting statutes, "[c]ourts must presume that a legislature says in a statute what it means and means in a statute what it says there." *Conn. Nat. Bank v. Germain*, 503 U.S. 249, 253–54 (1992). In writing for the Supreme Court of the United States, Justice Thomas stated that "[w]hen the words of a statute are unambiguous, then, this first canon is also the last: judicial inquiry is complete." *Id.* at 254 (cleaned up). Courts "need not choose between giving effect on the one hand to [one provision] and [effect] on the other to [another provision]" unless there is a "positive repugnancy" between the provisions such that they "pose an either-or proposition." *Id.* at 253. Put another way, when confronted with an

apparent conflict between two laws "[t]he preferred approach to statutory construction dictates that a reviewing court first determine if the perceived conflict between two laws is real." *Sunshine Dev. v. F.D.I.C.*, 33 F.3d 106, 113 (1st Cir. 1994).

Here, rather than determine if there was a "positive repugnancy" between the statutes such that they "pose[d] an either-or proposition," *Germain*, 503 U.S. at 253, or otherwise analyzing whether "the perceived conflict [wa]s more apparent than real," *Sunshine Dev.*, 33 F.3d at 113, the Court of Appeals stated that section 17-4 "*appears* to conflict" with section 17-33. *Daw*, 277 N.C. App. at 259 (emphasis added). The Court of Appeals made no effort to reconcile this alleged conflict. Instead, based in part on its erroneous determination that section 17-33 applies to parties detained by virtue of criminal process, the Court of Appeals reasoned that it needed to "harmonize the *apparent* conflict between § 17-33(2) and § 17-4(2)" by holding that "§ 17-33(2) provides an exception to the general rule provided by § 17-4(2)." *Id.* at 260 (emphasis added).

Even if section 17-33 applied to persons in custody by virtue of criminal process, which it does not, it would not conflict with section 17-4 because the plain language of these provisions indicates they apply to different classes of applicants and different procedural stages. Subsection 17-4(2) requires summary denial of an *application* where the party is "committed or detained by virtue of the *final order, judgment or decree* of a competent tribunal of civil or criminal jurisdiction, or by virtue of an execution issued upon such final order, judgment or decree." N.C.G.S. §

17-4(2) (emphasis added). In contrast, section 17-33 provides a limited set of circumstances under which a party who, after the application is reviewed and the writ is allowed, *see id.* § 17-9, is "in custody by virtue of civil *process* from any court legally constituted, or issued by any officer in the course of judicial proceedings" and may be discharged. *Id.* § 17-33 (emphasis added).

When interpreting a statute, a court must "give every word of the statute effect, presuming that the legislature carefully chose each word used." *N.C. Dep't of Corr. v. N.C. Med. Bd.*, 363 N.C. 189, 201 (2009). Thus, when the legislature provides that one statute applies to those "detained by virtue of the final order, judgment or decree," N.C.G.S. § 17-4(2), and another statute applies to those "in custody by virtue of civil process," *id.* § 17-33, we must presume that the legislature carefully chose to differentiate the applicability of these statutes.[6]

This choice comports with the legal reality that a person detained by virtue of civil process is not a person detained by virtue of a final order, judgment or decree. A person may be "detained by virtue of civil process," *id.*, under a variety of circumstances, including during the pendency of certain civil actions. *See id.* § 1-410 (2023) (listing civil cases in which "[t]he defendant may be arrested"). In addition, "[a]n involuntary commitment proceeding . . . is a proceeding of a civil nature," *In re*

---

[6] Both petitioner and our dissenting colleague note that the drafters of Chapter 17 were mindful that the statutory scheme may not have been perfect. We doubt that such self-awareness is unique to these drafters, and we decline the dissent's seeming invitation to use drafters' acknowledgment of their own imperfection as a license to ignore or otherwise depart from the plain language in the text of a valid legislative enactment.

*Underwood*, 38 N.C. App. 344, 347 (1978), and this Court has recognized that "recovery from a mental disease after commitment to an institution would seem to be an 'event which has taken place afterwards,' within the meaning of [section] 17-33(2)[.]" *In re Harris*, 241 N.C. 179, 180–81 (1954); *see also* N.C.G.S. § 122C-261 (2023) (providing procedures for "involuntary commitment of the mentally ill").

Because section 17-33's discharge provisions apply only to persons detained by virtue of civil process—not persons detained by virtue of a final order, judgment or decree—and because applications to prosecute the writ of habeas corpus submitted by such persons are not subject to summary denial under subsection 17-4(2), there is no conflict between these provisions. The Court of Appeals therefore erred in holding that "§ 17-33(2) provides an exception to the general rule provided by § 17-4(2)," *Daw*, 277 N.C. App. at 260, because the "general rule" provided by subsection 17-4(2) does not apply to parties covered by section 17-33. No exception is required.

In addition, the operation of Chapter 17 makes it a practical impossibility for section 17-33 to provide an exception to section 17-4. Because section 17-33 is not relevant until after an application to prosecute the writ has been granted, a return has been made, and a hearing has been held, it cannot practically conflict with section 17-4, a statute which specifically operates to prevent certain applicants from prosecuting the writ. *See* N.C.G.S. § 17-3 (barring persons "imprisoned . . . in cases specified in [N.C.]G.S. § 17-4" from prosecuting the writ of habeas corpus); *id.* § 17-9 (requiring the writ to be granted without delay unless the applicant is "by this

Chapter, prohibited from prosecuting the writ."). It would be strange indeed for the legislature to place an "exception" twenty-nine sections away from the "general rule," and the plain language of Chapter 17 confirms the legislature did no such thing.

The writ of habeas corpus is a mechanism designed to protect liberty and is a fundamental safeguard against arbitrary detention and abuse of power by the government. But the availability of this remedy is textually limited. Judges and courts are therefore constrained by the explicit language of Chapter 17 in reviewing habeas applications. Failure to abide by these clear requirements subjects judges and courts to charges of unlawfulness and arbitrariness given the unambiguous statutory scheme. Because the Court of Appeals' decision amounted to an exercise of legislative power under the guise of statutory interpretation, we expressly disavow its analysis, especially that portion of the opinion concerning the applicability of section 17-33 and the interpretation of the phrase "civil process."

## III.  Conclusion

When an applicant for a writ of habeas corpus is "detained by virtue of the final order, judgment or decree of a competent tribunal of civil or criminal jurisdiction," the habeas court *must* summarily deny the application. N.C.G.S. § 17-4(2). Courts may not thereafter consider a petitioner's application in light of the subsequent

provisions of Chapter 17 because the remainder of that chapter applies only when the application is allowed.[7]

Here, the trial court summarily denied petitioner's application under subsection 17-4(2) because it determined that petitioner was in custody by virtue of "valid final judgments entered by a court with proper jurisdiction." Such summary denial was proper, and the Court of Appeals erred when it failed to end its inquiry with the plain language set forth in section 17-4. We, therefore, expressly disavow the language in the Court of Appeals opinion, and we modify and affirm.

MODIFIED AND AFFIRMED.

---

[7] There may be instances where an application does not trigger the mandatory dismissal provisions in section 17-4 but the judge nevertheless later discovers at the hearing the applicant is detained "[b]y virtue of the final judgment or decree of any competent court of civil or criminal jurisdiction[.]" N.C.G.S. § 17-34. In that case, "[i]t is the duty of the court or judge forthwith to remand the party" to the place of their confinement. *Id.*

Justice EARLS dissenting.

Today, the majority closes a door the legislature left open. It converts an isolated subpart of a single habeas statute into an ironclad rule. According to the majority, subsection 17-4(2) extinguishes habeas for anyone imprisoned under a final criminal judgment—no exceptions. *See* N.C.G.S. § 17-4(2) (2023).

But that cannot be right. Neighboring statutes *require* habeas relief when a defendant's "original imprisonment was lawful" but a later "act, omission or event" demands his discharge. N.C.G.S. § 17-33(2) (2023). There is no way to reconcile that language with the majority's newly minted rule. For under the interpretation adopted today, subsection 17-4(2) bars habeas precisely *because* a defendant's "original imprisonment was lawful."

So one of two things is true: Either the majority is wrong, or the legislature did not mean what it said. Between those options, the choice should be easy. Language and logic cut against the majority's wooden interpretation. Read properly, section 17-33 creates a narrow exception to subsection 17-4(2), allowing defendants like Mr. Daw to challenge the "legal cause" for their "continu[ed]" imprisonment, even if that detention flows from a valid criminal judgment. *See* N.C.G.S. § 17-33. Precedent points the same way. Our courts have recognized section 17-33 as a carve out to subsection 17-4(2)—both expressly and implicitly. History fits hand-in-glove with text and caselaw. The General Assembly enacted sections 17-4 and 17-33 as part of the

same package, signaling their compatibility. By reading the former to swallow the latter, the majority creates disjuncture where the legislature intended congruence.

The Court of Appeals interpreted section 17-33 in line with statutory text, history, and precedent. The majority, however, discards that principled approach. It plucks subsection 17-4(2) from context, sculpting a categorical rule from cherry-picked language. And it twists the knife, scolding the Court of Appeals for "judicially rewr[iting] Chapter 17." That criticism is, in truth, a confession. For it is the majority that "radically alter[s] the plain language of our habeas corpus statutes." With lip service to legislative fidelity, the Court subverts the legislature's intent. Respectfully, I dissent.

## I.   Mr. Daw's claim is moot.

The majority's first misstep is deciding this case at all. It is moot—and has been even before the Court of Appeals decided it. North Carolina's "appellate courts do not decide moot cases." *Chavez v. McFadden*, 374 N.C. 458, 467 (2020). Correctly so. It is "not [our] province"—and it "ought not . . . be [our] desire"—to "decide questions or causes unnecessarily." *Hasty v. Funderburk*, 89 N.C. 93, 94 (1883). A case becomes moot if, "during the course of litigation," the "questions originally in controversy between the parties are no longer at issue" or the "relief sought has been granted." *Pearson v. Martin*, 319 N.C. 449, 451 (1987) (cleaned up); *see also Benvenue Parent-Tchr. Ass'n v. Nash Cnty. Bd. of Educ.,* 275 N.C. 675, 679 (1969) (collecting cases). Both are true here. I thus agree with Justice Riggs' analysis and expand on

her central point: In bypassing the usual mootness rules, the majority embarks on an "ill-advised," "ends-driven" crusade to rewrite our habeas statutes.

Mr. Daw filed his habeas petition in June 2020. In it, he sought release from prison based on the worsening COVID-19 pandemic and the state's then-existing policies for managing it. At the time, North Carolina was scrambling to handle the virus. In May 2020, Governor Cooper—like executive officers across the country—declared a state of emergency and ordered measures to limit the virus's spread. *See* Exec. Order No. 116 (Mar. 10, 2020). Other officials acted, too. In April of that year, the Secretary of the Department of Public Safety (DPS) invoked his statutory authority to "allow certain individuals to serve their sentence outside of a DPS prison facility, but under the supervision of community corrections officers and/or special operations officers." *See* Press Release, N.C. Dep't of Pub. Safety, Pandemic Prompts Department of Public Safety to Transition Some Offenders to Supervision in the Community (Apr. 13, 2020), https://www.ncdps.gov/news/press-releases/2020/04/13/pandemic-prompts-department-public-safety-transition-some-offenders.

When the Court of Appeals heard Mr. Daw's case, North Carolina remained under a declaration of emergency. *See* Exec. Order No. 215 (May 14, 2021). But things changed—and fast. Soon after oral argument, the executive branch agreed to the early reentry of thousands of state prisoners. *See* Joint Motion for Stay, *NAACP v. Cooper*, No. 20-CVS-500110 (N.C. Super. Ct. Feb. 25, 2021). Mr. Daw was one of

them—he was released just six days after the Court of Appeals heard his case. Things changed inside prisons, too. The state modified and strengthened the very mitigation policies Mr. Daw challenged via habeas. With conditions improved, Governor Cooper lifted the declaration of emergency in August 2022. *See* Exec. Order No. 267 (Aug. 15, 2022).

Mr. Daw and the state agree that this case is moot. So did the Court of Appeals. It conceded that Mr. Daw "ha[d] been released from prison and [was] now serving the remainder of his sentence in the community." *State v. Daw*, 277 N.C. App. 240, 244 (2021). Since Mr. Daw "received the relief requested in his petition," the controversy was dead. *See id.* But the court below—like the majority today—invoked the public-interest exception to reach the merits. *See id.* at 244–45.

That exception allows courts to decide a technically moot case that "involves a matter of public interest, is of general importance, and deserves prompt resolution." *N.C. State Bar v. Randolph*, 325 N.C. 699, 701 (1989). There is wisdom in that rule. And in proper cases, the public-interest exception serves principles of fairness and judicial economy. But it has limits, as our cases make clear. When abstention offers a more prudent course, we have refused to decide moot cases that raise "matter[s] of significant public interest." *Cape Fear River Watch v. N.C. Env't Mgmt. Comm'n*, 368 N.C. 92, 100 (2015); *see also Benvenue*, 275 N.C. at 680 (declining to "pass upon" important "constitutional questions" raised in appeal but "which have now become abstract questions of law"); *Wikel v. Bd. of Comm'rs*, 120 N.C. 451, 452 (1897)

(declining to reach "grave questions of constitutional law" because "the cause of action has been destroyed" and "this Court will not go into a consideration of the abstract question"). Two factors guide when the mootness rule yields to the public-interest exception.[1] First, the exception carries less force in idiosyncratic and fact-specific cases. *See Cape Fear River Watch*, 368 N.C. at 99–100 (withholding public-interest exception in case that involved a narrow subset of coal facilities and raised record-heavy, fact-bound claims). Second, we stay our hand when our decision would not "have any practical impact." *Id.* at 100. In Mr. Daw's case, both factors cut against reaching the merits.

For one, Mr. Daw's case is hyperspecific and fact-bound. He does not seek sweeping relief or unlatch the habeas floodgates. From the start, Mr. Daw has tethered his claim to his specific medical conditions and the specific risks raised by specific prison policies in the face of a specific virus. In the years since his petition, prison policies have changed and COVID-19 has ebbed in magnitude. The facts essential to Mr. Daw's habeas claim have thus evaporated as his appeal has evolved. And since Mr. Daw's petition hinged on his unique medical vulnerabilities to a unique virus, his case has a narrow blast radius.

---

[1] Our cases have recognized other exceptions to the mootness doctrine, such as when a claim is "capable of repetition, yet evading review." *Chavez v. McFadden*, 374 N.C. 458, 467 (2020). Though the Court of Appeals gestured to alternative bases for reviewing Mr. Daw's case, its substantive analysis dealt exclusively with the public-interest exception. Because other mootness exceptions were not examined below and are, at any rate, not applicable to Mr. Daw's claim, I confine my discussion accordingly.

For more proof on that score, look no further than the Court of Appeals. Despite Mr. Daw's already idiosyncratic claims, the court insisted on even more precision. It affirmed the summary denial of his petition for failing to forecast "admissible evidence individualized to the specific circumstances of [his] case that an 'act, omission or event' had occurred that entitled [him] to be discharged." *Daw*, 277 N.C. App. at 246–47. According to the court, Mr. Daw did not clarify "how [his] medical conditions put him at an elevated risk for serious illness or other medical complications from COVID-19." *Id.* at 264 (emphasis omitted). And without a particularized "evidentiary link between the general information in the application and the specific facts of [his] case," the court held that Mr. Daw did not raise "colorable claims" for habeas relief. *Id.* at 269. In both reasoning and result, the Court of Appeals did not adopt the "expansive interpretation" conjured up by the majority. It required an extra measure of specificity for Mr. Daw's already fact-specific claims. And so the decision below—like Mr. Daw's petition—has little purchase beyond its four corners, thus mitigating the "general importance" of the issues involved. *See Randolph*, 325 N.C. at 701.

Perhaps most strikingly, deciding this dispute will not have "any practical impact." *Cape Fear River Watch*, 368 N.C. at 100. Before the Court of Appeals issued its opinion, the state released Mr. Daw and others like him to serve their sentences at home. Mr. Daw completed his sentence in February 2021—over three years ago. And so the relief sought—discharge from incarceration—is not just past its expiration

date, but several years so. Our input "cannot have any practical effect on the existing controversy." *Roberts v. Madison Cnty. Realtors Ass'n*, 344 N.C. 394, 398–99 (1996). Or to be more accurate, it cannot affect the once-existing controversy—Mr. Daw's original dispute "has been settled" and "cease[s] to exist." *See Cochran v. Rowe*, 225 N.C. 645, 646 (1945).

The majority makes clear the real reason for discarding the usual mootness rules: It disagrees with the Court of Appeals and hopes to extirpate its decision, root and branch. Even before touching the merits, the majority excoriates the ruling below as "contrary to established law," in "tension" with statutory language, and in "direct conflict" with entrenched legal precepts. The Court, in other words, starts with the outcome and works backwards from there. That analysis is inverted. It is also an unprincipled assumption of the "law-making role," as Justice Riggs explains. For when a controversy is truly extinguished—as is the case here—we should not gratuitously interject merely "to determine which party should rightly have won in the lower court." *Benvenue*, 275 N.C. at 679. The majority's distaste for habeas does not make this peculiarly dormant case one of public significance. Along with Justice Riggs, I would follow our "usual response" and dismiss the appeal. *See Messer v. Town of Chapel Hill*, 346 N.C. 259, 260 (1997) (per curiam) (quoting *Simeon v. Hardin*, 339 N.C. 358, 370 (1994)).[2]

---

[2] I adhere to my view that neither precedent nor prudence require us to reflexively abrogate a Court of Appeals opinion—whether by vacating or "unpublishing" it—whenever a case becomes moot. My other writings address this point in more detail. *See Walker v. Wake*

## II.  The majority's analysis is textually dishonest, divorced from context, incongruent with precedent, and belied by history.

### A. Methodology

The majority is wrong from the ground up. It decides this case by stripping subsection 17-4(2) of context and pronouncing its language unambiguous in isolation. One struggles to classify this divide-and-conquer methodology. It is barely statutory interpretation, as the majority interprets precious little of the relevant statutes. And it is certainly not textualism, as even the strictest textualists concede that "[c]ontext is a primary determinant of meaning." Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 167 (2012). Perhaps "textual gerrymandering" is the best name for the majority's approach. For it "manipulat[es] statutory boundaries," packing and cracking the legislature's words to "sustain a preferred interpretation." *See* William N. Eskridge, Jr. & Victoria F. Nourse, *Textual Gerrymandering: The Eclipse of Republican Government in an Era of Statutory Populism*, 96 N.Y.U. L. Rev. 1718, 1732 (2021).[3]

---

*Cnty. Sheriff's Dep't*, 385 N.C. 300, 303 (2023) (Earls, J., dissenting) (explaining the problems with this Court "unpublishing" a Court of Appeals decision after the parties settled their dispute and asked us to dismiss the appeal); *see id.* at 307 (clarifying why "unpublishing" an opinion means that "for all intents and purposes, the Court effectively vacates the decision below"); *see also Mole v. City of Durham*, 384 N.C. 78, 91 (2023) (Earls, J., dissenting) (examining this Court's recent fondness for "unpublishing" Court of Appeals opinions and highlighting the procedural, administrative, and fairness concerns with that approach).

[3] Textualism is, of course, not the only approach to legal interpretation. *See* Stephen Breyer, *Reading the Constitution: Why I Chose Pragmatism,* Not *Textualism* (2024). I reference textualism because it appears to be the majority's professed approach and yet even by its own methodology, the majority's analysis is deeply flawed. I do not assert that textualism accurately represents what this Court's precedents establish as the principal or sole method of statutory and constitutional interpretation.

Whatever the label, the majority's methodology simply is not how courts read laws. To determine legislative intent—the guiding star of statutory analysis—we analyze "the statute as a whole, considering the chosen words themselves, the spirit of the act, and the objectives the statute seeks to accomplish." *Brown v. Flowe*, 349 N.C. 520, 522 (1998). We first look to a provision's plain language, as the "actual words of the legislature are the clearest manifestation of its intent." *N.C. Dep't of Corr. v. N.C. Med. Bd.*, 363 N.C. 189, 201 (2009). If those words are "clear and unambiguous within the context of the statute, they are to be given their plain and ordinary meanings." *Brown*, 349 N.C. at 522 (citing *Hyler v. GTE Prods. Co.*, 333 N.C. 258, 262 (1993)); *see also Union Carbide Corp. v. Offerman*, 351 N.C. 310, 315 (2000).

But the "plainness or ambiguity of [a] statut[e's] language" cannot "turn solely on dictionary definitions of its component words" viewed in an echo chamber. *Yates v. United States*, 574 U.S. 528, 537 (2015) (cleaned up). As this Court long ago recognized, a "phrase or clause or sentence may vary greatly in color and meaning according to the circumstances of its" invocation. *Watson Indus., Inc. v. Shaw*, 235 N.C. 203, 210 (1952). And so a provision's language draws substance from the "specific context in which [it] is used, and the broader context of the statute as a whole," *Yates*, 574 U.S. at 537 (cleaned up); *see also Deal v. United States*, 508 U.S. 129, 132 (1993) (applying the "fundamental principle of statutory construction (and, indeed, of language itself) that the meaning of a word cannot be determined in isolation, but must be drawn from the context in which it is used"). In practical view,

legal instruments "typically contain[ ] many interrelated parts that make up the whole," and so the "entirety of the document . . . provides the context for each of its parts." Scalia & Garner, at 167. Meaning, in other words, is a function of context. *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 132 (2000) ("The meaning—or ambiguity—of certain words or phrases may only become evident when placed in context."). Which is why, to again quote Justice Scalia, "In textual interpretation, context is everything." Antonin Scalia, *A Matter of Interpretation* 37 (1997).

That principle holds special sway for statutes. *Rodgers, McCabe & Co. v. Bell*, 156 N.C. 378, 385 (1911). And for good reason—the General Assembly does not legislate in fragments but on top of and "with reference to" broader legal schemes. *Raeford Lumber Co. v. Rockfish Trading Co.*, 163 N.C. 314, 317 (1913) (cleaned up). Put simply, the legislature's "chosen words" function within "the statute as a whole." *Brown*, 349 N.C. at 522 (cleaned up). To faithfully interpret that language, judges must "consider the entire text, in view of its structure and of the physical and logical relation of its many parts." Scalia & Garner, at 167. Courts ignore statutory context at their own peril. Reading a provision wrenched from its setting is like measuring an iceberg without looking beneath the surface. In both cases, the incomplete perspective yields a distorted result divorced from both reality and common sense. Even Justice Scalia bemoaned the "failure to follow the whole-text canon" as an all too common "interpretive fault" that dislocates language from its intended meaning.

*Id.*

That lesson is not new. As far back as 1628, Sir Edward Coke explained that "it is the most natural and genuine exposition of a statute to construe one part of the statute by another part of the same statute, for that best expresseth the meaning of the makers." 1 Edward Coke, *The First Part of the Institutes of the Laws of England, or, a Commentary upon Littleton* § 728, at 381a (Dublin, College-Green 14th ed. 1791). Over the centuries, context has retained its primacy, requiring jurists to construe "the entire instrument, and not merely . . . disjointed parts of it." *See* Herbert Broom, *A Selection of Legal Maxims* 440 (Joseph Gerald Pease & Herbert Chitty eds., 8th ed. 1911).

This Court has followed that time-honored maxim. In "determining legislative intent," we have explained, "the words and phrases of a statute must be interpreted contextually"—courts do not read segments of a statute in an echo chamber. *See In re J.E.B.*, 376 N.C. 629, 634 (2021) (cleaned up). We have returned to that principle again and again. Our cases, for example, denounce reading statutes "as detached, unrelated sentences." *State v. Fox*, 262 N.C. 193, 195 (1964). We have rejected "rigid interpretation[s] of isolated provisions" unmoored from "the whole of the statutory text." *In re A.P.*, 371 N.C. 14, 18 (2018). And we have gone further, explaining that courts disserve the legislature's intent by scrutinizing "statutory provisions" in a

vacuum "rather than analyzing the relevant statutory language in its entirety."[4]

---

[4] The importance of linguistic context transcends time and subject matter. A glance through our cases makes it difficult to imagine a more firmly entrenched interpretive principle. *See, e.g., Rodgers, McCabe & Co. v. Bell*, 156 N.C. 378, 385 (1911) ("In order to determine the true intent of the Legislature, the particular clauses and phrases should not be studied as detached and isolated expressions, but the whole and every part of the statute must be considered in fixing the meaning of any of its parts. . . . Having reference to this general principle, it is also well understood that a statute should be so construed as to make it harmonize with the existent body of the law, unless the legislative intent is clearly expressed to the contrary, and that each and every clause shall be allowed significance if this can be done by fair and reasonable interpretation." (cleaned up)); *Victory Cab Co. v. City of Charlotte*, 234 N.C. 572, 576 (1951) ("[T]he language of the statute must be read not textually, but contextually, and with reference to the matters dealt with, the objects and purposes sought to be accomplished, and in a sense which harmonizes with the subject matter."); *Puckett v. Sellars*, 235 N.C. 264, 268 (1952) (instructing courts to adopt a "reasonable construction of [statutory] language" that "is consonant with the general purpose and intent of the Act under consideration, is in harmony with the other provisions of the statute, and serves to effectuate the objective of the legislation"); *Piedmont Canteen Serv., Inc. v. Johnson*, 256 N.C. 155, 160 (1962) (explaining that "part of a statute may not be interpreted out of context" but rather "construed as a part of the whole"); *In re Hardy*, 294 N.C. 90, 95–96 (1978) ("Words and phrases of a statute may not be interpreted out of context, but individual expressions must be construed as a part of the composite whole and must be accorded only that meaning which other modifying provisions and the clear intent and purpose of the act will permit." (cleaned up)); *Jolly v. Wright*, 300 N.C. 83, 86 (1980) ("Word and phrases of a statute may not be interpreted out of context; rather, individual expressions must be interpreted as part of a composite whole, in a manner which harmonizes with the other provisions of the statute and which gives effect to the reason and purpose of the statute."); *State v. Jones*, 305 N.C. 520, 531 (1982) ("An ordinance or statute must be considered as a whole, and its language should not be isolated in order to find fault with its descriptive character when the general sense and meaning of the statute can be determined from reading such language in proper context and giving the words ordinary meaning."); *Burgess v. Your House of Raleigh, Inc.*, 326 N.C. 205, 215 (1990) ("A construction which operates to defeat or impair the object of the statute must be avoided if that can reasonably be done without violence to the legislative language. To this end, the words and phrases of a statute must be interpreted contextually, in a manner which harmonizes with the other provisions of the statute and which gives effect to the reason and purpose of the statute." (cleaned up)); *In re D.S.*, 364 N.C. 184, 187 (2010) ("Legislative intent controls the meaning of a statute; and in ascertaining this intent, a court must consider the act as a whole, weighing the language of the statute, its spirit, and that which the statute seeks to accomplish. The statute's words should be given their natural and ordinary meaning unless the context requires them to be construed differently." (cleaned up)); *Rhyne v. K-Mart Corp.*, 358 N.C. 160, 188 (2004) ("[T]his Court does not read segments of a statute in isolation. Rather, we construe statutes *in pari materia*, giving effect, if possible, to every provision."); *Dickson v. Rucho*, 366 N.C. 332, 342

*State v. James*, 371 N.C. 77, 92 (2018).

On top of context, other principles guide our statutory analysis. Specificity, for instance, imports meaning. *See State ex rel. Utils. Comm'n v. Lumbee River Elec. Membership Corp.*, 275 N.C. 250, 260 (1969). For that reason, if "two statutes arguably address the same issue, one in specific terms and the other generally, the specific statute controls." *High Rock Lake Partners, LLC v. N.C. DOT*, 366 N.C. 315, 322 (2012). That interpretive tool is "most common[ly]" needed in cases like this one: Where "a general prohibition"—like subsection 17-4(2)—is "contradicted by a specific permission"—like section 17-33. *See* Scalia & Garner, at 183. More basically, when statutes cover the same "matter or subject," this Court construes them together *in pari materia. DTH Media Corp. v. Folt*, 374 N.C. 292, 300 (2020) (cleaned up). Our interpretation "must sound a harmonious—not a discordant—note in the general tenor of the law." *Watson Indus.*, 235 N.C. at 210. And we must give "effect, if possible, to all provisions without destroying" their meaning. *DTH Media Corp.*, 374 N.C. at, 300 (cleaned up). Above all, statutory analysis must embrace "the spirit of the act" and what it "seeks to accomplish." *Lenox, Inc. v. Tolson*, 353 N.C. 659, 664 (2001)

---

(2013) ("We read [a provision] in the context of the entire article in which it appears."); *N.C. Dep't of Transp. v. Mission Battleground Park, DST*, 370 N.C. 477, 483 (2018) (reversing Court of Appeals in part for failing to interpret a subsection "holistically with the rest of the statute"); *Town of Pinebluff v. Moore County*, 374 N.C. 254, 256 (2020) (explaining that statutory subsections "must be read in the context of the rest of the statute, since we assume that the Legislature acted with full knowledge of prior and existing law" (cleaned up)); *In re J.E.B.*, 376 N.C. 629, 634 (2021) (admonishing courts from divvying up a provision's language "to the exclusion of the rest of the statute").

(cleaned up).

In discarding those interpretive rules, the majority proves their value. For the statutes that emerge from today's decision are quite different from those the legislature passed. That departure is unjustified.

## B. Statutory Text

Start where the majority should have—the language of our habeas statutes viewed in context.[5] When a person files a habeas petition, the court must "grant the writ without delay, unless it appear from the application itself or from the documents annexed" that the applicant is "prohibited from prosecuting the writ." N.C.G.S. § 17-9 (2023). Section 17-4 lists cases in which the "[a]pplication to prosecute the writ shall be denied." N.C.G.S. § 17-4. Most relevant here, subsection 17-4(2) withholds the writ from a petitioner:

> [C]ommitted or detained by virtue of the final order, judgment or decree of a competent tribunal of civil or criminal jurisdiction, or by virtue of an execution issued upon such final order, judgment or decree

N.C.G.S. § 17-4(2).

In effect, the majority begins and ends its analysis with that lone subpart. Intentionally so, as that language—read in a vacuum—yields the majority its preferred result. But subsection 17-4(2) is not the final word on habeas claims; it is

---

[5] It is, of course, disappointing that the majority finds it "reductive" to flesh out the basis of a dissent and to offer another perspective on important legal issues. Even so, I believe that our state, its law, and the people we serve merit a full and fair elucidation of the case before us.

but one provision amid a sea of interlocking laws. And its language, placed in the proper setting, takes on a different hue than the majority gives it.

Consider, for instance, section 17-32. When a petitioner "is brought on a writ of habeas corpus" before a "court or judge," that decisionmaker must examine "the cause of the [petitioner's] confinement or restraint." N.C.G.S. § 17-32 (2023). The statute also casts a wide net, embracing habeas petitioners committed "for any criminal or supposed criminal matter or not." *Id.*; *cf. In re Bailey*, 203 N.C. 362, 365 (1932), *rev'd on other grounds*, 289 U.S. 412 (1933) (applying contemporary version of section 17-32 to criminal proceeding and interpreting "statutory words" to "preclude the idea that such hearing shall be perfunctory and merely formal"). If "facts are alleged to show that the imprisonment or detention is illegal, or that the party imprisoned is entitled to his discharge," the court must "hear the allegations and proofs on both sides." N.C.G.S. § 17-32. And after taking evidence, it must award the relief to which "justice appertains in delivering, bailing, or remanding" the petitioner. *Id.* The next three provisions track section 17-32's listed remedies, detailing when and why courts must award habeas relief. *See* N.C.G.S. §§ 17-33 (titled: "When party discharged"), -34 (titled: "When party remanded"), -35 (2023) (titled: "When . . . party bailed or remanded").

Key here, section 17-33—the statute cited by Mr. Daw—obliges a court to discharge a habeas petitioner from unlawful imprisonment or its "continuance." N.C.G.S. § 17-33. It opens with a broad command:

> If no legal cause is shown for such imprisonment or
> restraint, or for the continuance thereof, the court or judge
> shall discharge the party from the custody or restraint
> under which he is held.

*Id.* That language sets no limits—it embraces criminal defendants and civil detainees alike. We know that for three reasons. First, the statute requires discharge from "*such* imprisonment or restraint," *id.* (emphasis added), an adjectival callback to the modes of confinement itemized in section 17-32. *See Such, Black's Law Dictionary* 1732 (11th ed. 2019) ("That or those; having just been mentioned"). That matters, in turn, because section 17-32 directs courts to examine the factual and legal basis for a petitioner's "commitment for any criminal or supposed criminal matter or not." N.C.G.S. § 17-32. In light of their textual and spatial nexus, the "imprisonment or restraint" embraced by section 17-33 includes the forms of criminal process reviewable under section 17-32. *See* N.C.G.S. § 17-33.

Section 17-33's second sentence confirms the broad sweep of its first. After requiring discharge if there is no "legal cause" for a petitioner's "imprisonment or restraint," the statute pivots to a specific class of habeas claims:

> But if it appears on the return to the writ that the party is
> in custody by virtue of civil process from any court legally
> constituted, or issued by any officer in the course of judicial
> proceedings before him, authorized by law, such party can
> be discharged only in one of the following cases:

*Id.* That second sentence starts with the disjunctive "but," making clear its break from the guidance before. *See But, The American Heritage College Dictionary* (3d ed. 2000) ("Used to indicate an exception"). In setting specific rules for specific

petitioners, though, the legislature kept the general regime that applies to claimants outside that category but within the statute's ambit. So even if section 17-33 provides narrower grounds for relief to those detained "by virtue of civil process," it retains the baseline rule for petitioners excluded from that group but embraced by the statute's first sentence. *See* N.C.G.S. § 17-33. For that reason, petitioners "imprisoned or restrained" by modes other than "civil process" may still test the "legal cause" for their continued custody. *See id.*

Consider an analogy. Suppose a high school's attendance policy says:

> A student's absence from class may be excused if there is a reasonable basis for it. But freshmen and sophomores may only miss class for these reasons: (1) illness or (2) a family emergency.

A person reading that text would understand that juniors and seniors have more leeway than do freshmen and sophomores. The policy follows its general rule with specific strictures on a specific group of students. And the natural takeaway from that structure and language is that students exempt from the enumerated limits are governed by the default "reasonable basis" rule. Otherwise, there would be no reason for the restrictions at all. A senior, for instance, may justifiably miss class to take the SAT or visit a prospective college. But the same senior could also stay home if they caught the flu. Upperclassmen could thus offer a "reasonable basis" to excuse an absence based on grounds broader than—but including—the reasons available to freshmen and sophomores. By singling underclassmen out and fixing specific limits on them, the policy impliedly excludes other students from those strictures, retaining

the default standard that generally controls.

The same principle applies to section 17-33. After setting a default rule for petitioners "imprison[ed] or restrain[ed]" in the modes captured by section 17-32, the statute offers specific guidance for people confined "by virtue of civil process" from a "legally constituted" court or authorized judicial officer. *Id.* But though that latter class of habeas petitioner is limited to discrete grounds for relief, detainees outside that group—including criminal defendants—may still challenge the "legal cause" for their imprisonment or its "continuance." *See id.*

Finally, surrounding provisions affirm section 17-33's extension to criminal cases. Take section 17-30, which applies to a petitioner "detained upon any criminal accusation." N.C.G.S. § 17-30 (2023). For those types of claims, the court may withhold an "order for the discharge of such party" until the district attorney has received "sufficient notice" of the proceedings. *Id.* The provision thus contemplates criminal defendants' recourse to habeas discharge, the relief covered and controlled by section 17-33.

The statutes after section 17-33 point the same way. For instance, sections 17-34 and 17-35 flesh out the other remedies listed in section 17-32—namely, remand and bail. Those provisions set rules for "the party" referenced in section 17-32 and accordingly extend their reach to forms of criminal process. *See* N.C.G.S. §§ 17-34, -35. Also notable, if a court discharges a habeas petitioner—the remedy detailed in section 17-33—yet another statute protects that person from being "again imprisoned

or detained for the same cause," except by order of the presiding court. N.C.G.S. § 17-38 (2023). Section 17-38 illustrates that "imprisonment" and "detention" are distinct forms of confinement embraced by section 17-33. *See id.* And it underscores the importance the legislature placed on discharge as a remedy. To give effect to that measure of relief, the statute prescribes a $2,500 penalty for anyone who unlawfully reimprisons someone whom habeas has freed. *Id.* In those ways, too, statutory context shows that section 17-33 is part of—and intertwined with—a habeas regime that reaches civil "restraint" and criminal "imprisonment" alike.

Most damning for the majority, section 17-33(2) blesses habeas claims when a defendant's "original imprisonment was lawful," but a later "act, omission or event" requires discharge. N.C.G.S. § 17-33(2). That language prefigures and provides for habeas petitions otherwise precluded by subsection 17-4(2). A "lawful" prison sentence is, by necessity, one authorized by a "final judgment" from a "competent" court. *See In re Swink*, 243 N.C. 86, 90 (1955) (explaining that the "lawful imprisonment of a person who pleads or is found guilty of a criminal offense" must rest on a "valid judgment of a court of competent jurisdiction"); *see also In re Burton*, 257 N.C. 534, 540 (1962).

So section 17-33, as written, cannot cohabit with the version of subsection 17-4(2) concocted by the majority. If, as the majority holds, a valid conviction kills habeas petitions at the threshold, then nothing that follows a duly imposed sentence could ever warrant a petitioner's discharge. Whenever a defendant's "original

-39-

imprisonment was lawful"—and precisely *because* the "original imprisonment was lawful"—the majority would foreclose habeas relief. By reading subsection 17-4(2) to demand that result, the majority renders section 17-33 a ticket to nowhere—a curious result for an opinion that claims fidelity to plain text. *Cf.* Scalia & Garner, at 174 ("[I]t is no more the court's function to revise by subtraction than by addition").

The majority launders its holding through a hodgepodge of analytical moves, none sound. As its first ploy, the majority wrests subsection 17-4(2) from the statutory scheme and reads it in a vacuum. Measured against itself, the majority proclaims subsection 17-4(2)'s language "definite" and "unambiguous." It then converts that artificial clarity into an airtight rule, mandating that "inquiry into the availability of habeas relief" must end with subsection 17-4(2). But the majority's fragmentary analysis is methodologically infirm and logically bankrupt. In truth, subsection 17-4(2)'s lucidity is manufactured—it appears "definite" and "unambiguous" only because the majority erases everything that says differently.

From that first misstep, the majority makes a second. It scrubs disfavored habeas statutes of relevance, converting subsection 17-4(2) into an impenetrable command. The majority recasts that provision as a flat decree: habeas courts "*must* summarily deny [an] application" from a person detained under a final judgment. Per the majority, every other provision in Chapter 17—including section 17-33—kicks in "only when [an] application is allowed" in line with subsection 17-4(2). Courts must woodenly apply that provision without "consider[ing] a petitioner's application in

light of th[ose] subsequent provisions." Translation: subsection 17-4(2) overrides all the statutes that come after. So that provision, as interpreted by the majority, is no mere "gatekeeper"—it is a gate closer for habeas claims that should otherwise proceed.

The majority does not merely shut the habeas doors; it seals them closed. It announces that section 17-33 has no bearing on section 17-4, as the former does not apply to criminal process and "is not relevant until after an application to prosecute the writ has been granted." But in that holding, too, the majority repeats its earlier flaws. As its opening move, the Court selectively excerpts section 17-33's text. It omits the statute's first sentence, insisting that the second is the only "relevant portion." The majority does not justify that excision or explain why just some of the legislature's words are "relevant." But we soon understand the gambit, as the majority offers its carefully snipped text as proof that section 17-33 *only* applies to "civil process."

That conclusion overlooks the statute's full language and its fit with neighboring provisions. True to form, the majority ignores section 17-33's linguistic and spatial nexus to section 17-32, which expressly extends habeas review to "commitment[s] for any criminal or supposed criminal matter." N.C.G.S. § 17-32. It ignores section 17-33's application to "imprisonment," N.C.G.S. § 17-33, the quintessential mode of criminal confinement, *see In re Swink*, 243 N.C. at 90. And it

STATE V. DAW

*Earls, J., dissenting*

ignores the internal structure and logical mechanics of section 17-33's text.[6]

As explained earlier, section 17-33's mention of "civil process" qualifies, rather than defines, the scope of discharge relief. Recall the provision's opening sentence. In capacious terms, it requires a petitioner's release if there is no "legal cause" for his imprisonment or "the continuance thereof." N.C.G.S. § 17-33. The next sentence tempers the opening rule for petitioners confined "by virtue of civil process."[7] *Id.* For that sliver of habeas petitioners, discharge is proper "only" in specified cases. *Id.* True, that language does not apply to criminal defendants. But section 17-33's first sentence *does*, as those petitioners are "imprison[ed]," *id.*, and "such imprisonment" includes "commitment for any criminal or supposed criminal matter," *see* N.C.G.S. § 17-32. So for petitioners detained through mechanisms other than "civil process,"

---

[6] To justify its cherry-picked reading of section 17-33, the majority contends that Mr. Daw "has not argued that there is no legal cause for his detention under the [provision's] first sentence." That observation might matter if it was at all relevant to today's holding. But rather than confining its analysis to a particular part of section 17-33, the majority flatly forecloses the statute's availability for people in Mr. Daw's shoes.

[7] This reasoning takes "civil" at face value, accepting for argument's sake that the term imports a distinction between civil versus criminal law. But the precedent and post-Civil War context surrounding section 17-33's enactment suggest that its drafters used "civil" to distinguish civilian courts from the military's justice system. *See, e.g., Cox v. Gee*, 2 Win. 131, 132 (1864) (denying habeas petition from soldier in Confederate Army and explaining that a soldier is in "military custody" not reachable "through *civil* tribunals, until at least, his term of enlistment expires") (emphasis added); *id.* at 133 ("Legitimately inquiry in such cases goes only to the extent of ascertaining whether the prisoner is rightfully in the army. If so, the *civil* tribunals leave him to the military, to be dealt with according to their rules and regulations.") (emphasis added); *In re Bryan*, 60 N.C. 1, 42 (1863) (affirming judiciary's jurisdiction and duty to "discharge [a] *citizen* whenever it appears that he is unlawfully restrained of his liberty by an officer of the Confederate States") (emphasis added); *In re Moore*, 64 N.C. 802, 808–10 (1870). Even accepting the civil-criminal dichotomy—as the majority uncritically does—section 17-33's reference to "civil process" does not extinguish the statute's application to criminal proceedings.

section 17-33's default rule holds firm. Defendants like Mr. Daw may thus seek habeas relief when their "continu[ed]" imprisonment is shorn of "legal cause." N.C.G.S. § 17-33.

Against that backdrop, the majority's cramped reading of subsection 17-4(2) cannot stand. At least, not if the legislature passed the laws it did. And not if bedrock interpretive rules are followed. Properly read, section 17-33 creates an exception to subsection 17-4(2). Though the latter provision generally withholds habeas relief from duly incarcerated petitioners, the former varies that rule in specific cases. So even if a defendant's "original imprisonment was lawful," he may test the "legal cause" for his "continu[ed]" restraint based on an intervening "act, omission or event." *See* N.C.G.S. § 17-33(2). That interpretation accounts for the context and language of the habeas statutes, allowing the "specific" guidance of section 17-33 to supplement the "more general" precept in subsection 17-4(2). *LexisNexis Risk Data Mgmt. v. N.C. Admin. Off. of the Cts.*, 368 N.C. 180, 187 (2015) (cleaned up). It respects the General Assembly's wisdom, presuming that the policy-making branch enacts statutes "with full knowledge of prior and existing law." *Fearrington v. City of Greenville*, 900 S.E.2d 851, 866 (N.C. 2024) (cleaned up). And it harmonizes the legislature's enactments, giving effect to the full statutory scheme and avoiding a construction that renders section 17-33 superfluous. *Id.* ("We presume . . . that the General Assembly does not adopt superfluous legislation." (cleaned up)).

In fact, there is special reason to pursue harmony here. The Drafting

Committee of the habeas statutes foretold the "inevitab[ility] that imperfections will be found" in the newly enacted laws. N.C. Code Civ. P. of 1868, Second Report of the Code Commissioners. For courts facing those "imperfections," the Committee requested a "generous criticism of our labors," underscoring that each part was intended "to fit in and harmonize with the other[s]" as a "consistent whole." *Id.* It noted, too, that the separate statutory provisions carry independent force. *See id.* ("[T]here is scarce any part which can be altered without involving alteration in some or numerous others."). In other words, the legislature expressly disclaimed the fragmented approach the majority deploys today.

Allowing Mr. Daw's petition also aligns with settled understandings about the purpose and reach of habeas claims. This Court has long held that habeas is not an error-correcting mechanism. *See State v. Hooker*, 183 N.C. 763, 766 (1922). The writ allows relief from void judgments, not flawed ones. *See In re Burton*, 257 N.C. at 540–41. Subsection 17-4(2) codifies that distinction: If duly convicted, a defendant may not use habeas to relitigate the *merits* of a valid criminal judgment. Put simply, section 17-4 precludes appeals by another name. *See In re Palmer,* 265 N.C. 485, 486 (1965).

But section 17-33 permits—and Mr. Daw raises—a different type of claim. The statute contemplates cases where a defendant's sentence—and the final judgment authorizing it—was lawful when imposed. Even so, the legislature left the habeas doors ajar if a later "act, omission or event" dissolves the "legal cause" for a once-valid imprisonment. N.C.G.S. § 17-33(2). When an inmate seeks relief under section 17-33,

STATE V. DAW

*Earls, J., dissenting*

then, a court need not relitigate the merits of the original conviction or sentence. The question, instead, is whether intervening events have changed the nature of the confinement and eroded the legal justification for its "continuance"—an inquiry well-suited for habeas review. *See In re Renfrow*, 247 N.C. 55, 59 (1957) (explaining that the issue raised at a habeas "hearing for *alleged unlawful imprisonment* is whether petitioner is *then* being unlawfully deprived of his liberty") (second emphasis added).

Since section 17-33 claims do not allege error in a conviction, judgment, or original sentence, they fit with subsection 17-4(2)'s general prohibition on repackaged appeals. So read, subsection 17-4(2) can coexist with section 17-33. Even if a habeas petitioner may not attack the merits of a final criminal judgment, he *can* challenge added restraint not authorized by the original judgment—here, the alleged irresponsible exposure to a deadly and novel virus. *See State v. Austin*, 241 N.C. 548, 550–51 (1955) (explaining that a "properly convicted" defendant may, on habeas, attack punishment imposed in "excess of that authorized by law" without "disturbing the valid portion of the sentence"); *see also State v. Stafford*, 274 N.C. 519, 536 (1968) (noting that defendant sentenced in excess of legal bounds was "entitled to his discharge upon a writ of habeas corpus when he had served the time the court could lawfully impose").

Rather than apply the statutes enacted, the majority engineers those it would prefer. It is a regrettable choice—not just for the avenues it seals shut, but also for the interpretive rules it discards. By tunnel-visioning on subsection 17-4(2), the Court

elevates an atomized provision into a blanket rule, minting an intratextual hierarchy without legislative blessing. It injects discord where the General Assembly intended harmony. And it exiles section 17-33 to superfluity—both on paper and in practice.

## C. Precedent

Precedent cuts in Mr. Daw's favor, too. Our appellate courts have already interpreted the habeas statutes and rejected the majority's myopic reading. Some cases did so expressly, construing section 17-33 to allow habeas relief otherwise barred by subsection 17-4(2). Others did so implicitly by examining the merits of a habeas petition from a person detained under a valid final judgment. That caselaw confirms what the statutes makes clear: Though subsection 17-4(2) sets a general rule, section 17-33 allows habeas claims in a narrow subset of cases. So the majority does not restore our habeas provisions to their longstanding meaning—it contorts their language and precedent interpreting it.

Begin with express rejections of the majority's new rule. In *In re Harris*, for instance, we endorsed a mental patient's recourse to habeas, "notwithstanding [subsection] 17-4(2)." 241 N.C. 179, 180 (1954). The petitioner in that case was committed to a state mental hospital. *Id.* at 179. After two years, he sought release, alleging that he was "of sound mind and entirely competent and capable of managing his own affairs." *Id.* The petitioner—invoking existing statutes—argued that a jury trial was the "permissible procedure by which he may be declared competent." *Id.* at 180 (cleaned up). We disagreed, explaining that his "remedy is by habeas corpus." *Id.*

(emphasis omitted). That conclusion sprang from the same habeas statutes in place today. Section 17-32 obliged courts to examine whether "the party imprisoned is entitled to his discharge." *Id.* (citing N.C.G.S. § 17-32). And that language fit with subsection 17-33(2)—a person may "become entitled to be discharged" based on "some act, omission or event" during his confinement. *Id.* at 181.

Fitting those provisions together, we explained that "recovery from a mental disease after commitment to an institution would seem to be an 'event which has taken place afterwards,' within the meaning of [subsection] 17-33(2), entitling an inmate to discharge under [section] 17-32." *Id.* That "[wa]s so notwithstanding [subsection] 17-4(2)," we observed—in other words, section 17-33 coexisted with and offered a specific carve out to subsection 17-4(2)'s general summary denial rule. *Id.* at 180. Extending that logic, we repudiated earlier decisions barring habeas courts from examining whether a petitioner's current condition permitted their continued detention. *Id.* (citing *Ex parte Chase*, 193 N.C. 450 (1927)). Nor was *Harris* an anomaly—it built on other cases extending habeas relief in the face of subsection 17-4(2). *See State v. Queen*, 91 N.C. 659, 661–62 (1884) (granting habeas relief to a defendant confined under a constitutionally defective sentence, even though the contemporary version of subsection 17-4(2) directed "that the writ should be denied" to petitioners "imprisoned by virtue of the judgment of competent jurisdiction of the crime for which he is imprisoned").

The Court of Appeals has held the same for nearly fifty years. Since 1976, five

cases have pointed to section 17-33 as a remedy for "a clear instance of constitutional infirmity," even when the petitioner's original imprisonment was lawful. *In re Stevens*, 28 N.C. App. 471, 474 (1976); *see also Hoffman v. Edwards*, 48 N.C. App. 559 (1980); *Freeman v. Johnson*, 92 N.C. App. 109 (1988); *State v. Leach*, 227 N.C. App. 399 (2013); *State v. Daw*, 277 N.C. App. 240 (2021).

Federal courts have distilled the same teaching from our habeas statutes, allowing validly incarcerated defendants to challenge aspects of their confinement via section 17-33 claims. *See, e.g., Warren v. Smith*, No. 5:13-HC-2220-D, 2015 WL 631331, at *3 (E.D.N.C. Feb. 12, 2015) (citing subsection 17-33(2) and explaining that "[u]nder North Carolina law, [petitioner] can seek habeas relief for the alleged lack of due process in his parole revocation hearing and the revocation for failure to pay supervision fees"); *Bey v. Hooks*, No. 5:15-HC-2097-FL, 2018 WL 2465471, at *4 (E.D.N.C. June 1, 2018) (quoting subsection 17-33(2) and reasoning that North Carolina prisoners "may assert constitutional challenges to parole proceedings by filing a petition for writ of habeas corpus in state court"). On questions of state law, of course, federal decisions are not binding authority. But they still hold persuasive value—especially because they cohere with North Carolina precedent. Put simply, state and federal judges have read the same statutes and reached the same conclusion about the viability of section 17-33 claims. The consistency of that trend lays bare the majority's aberration from it.

Implicitly, too, our courts have rejected the majority's rigid interpretation of

subsection 17-4(2). Our precedent has allowed duly imprisoned defendants to attack substantive infirmities in their continued incarceration. We have "frequently held" that "where a convicted criminal is detained under a sentence not authorized by law, he is entitled to be heard." *In re Holley*, 154 N.C. 163, 168 (1910). The most obvious case is when a defendant's sentence is "authorized in kind," but "extends in duration beyond what the law expressly permits." *Id.* That prisoner, we have explained, "may be relieved from further punishment" after "serving the lawful portion of the sentence." *Id.*; *see also State v. Phillips*, 185 N.C. 614, 619 (1923); *Austin*, 241 N.C. at 548 (granting habeas relief and ordering inmate discharged because he served the legal portion of his sentence and the remainder was thus excessive); *Ex parte Williams*, 149 N.C. 436, 438–39 (1908) (affirming habeas discharge for defendant pardoned by the governor "after conviction"); *State v. Burnette*, 173 N.C. 734, 736–38 (1917) (allowing defendant jailed under suspended judgments to bring habeas claim "attack[ing] the validity of the sentence" because he "was entitled to a public hearing in the court" rather than "before the trial justice acting privately in his office"); *State v. Massey*, 265 N.C. 579, 580–81 (1965) (per curiam) (reversing denial of habeas petition and ordering defendant released because a misprint in penal statutes "created confusion," leading trial judge to give defendant "excessive sentences" for consolidated misdemeanors and, in turn, three later convictions for escaping prison); *State v. Niccum*, 293 N.C. 276 (1977) (considering habeas challenge to legality of defendant's continued imprisonment beyond the maximum term for committed

-49-

youthful offenders).

Key here, we have allowed prisoners to raise constitutional challenges to their ongoing confinement. *See, e.g., Queen*, 91 N.C. at 661–62; *Phillips*, 185 N.C. at 619–22 (awarding habeas release on due process grounds because trial court allowed nonjudicial officers to decide whether defendant violated the terms of his suspended sentence without formal process); *State v. McBride*, 240 N.C. 619, 622 (1954) (reversing denial of habeas petition and ordering immediate release on apparent due process grounds because trial court erroneously revoked suspended sentence without any "finding that the defendant violated any one of the conditions upon which his sentence was suspended").

In *Jones,* perhaps our most recent foray, we assessed whether a habeas petitioner serving a life sentence was lawfully imprisoned. *Jones v. Keller*, 364 N.C. 249 (2010). In that case, the petitioner did not dispute the integrity of his original conviction or sentence. Instead, he lodged statutory and constitutional challenges to a Department of Corrections (DOC) policy for awarding good time credits. *Id.* at 251. As a rule, the DOC did not apply those credits to prisoners who—like the petitioner— were serving life sentences. *Id.* at 254. On habeas, the petitioner challenged the DOC's approach. In his view, withholding those time credits violated his "rights to due process and to equal protection." *Id.* at 256. And if his "good time, gain time, and merit time [were] credited to his life sentence"—"statutorily defined as a sentence of eighty years"—he was entitled to release. *Id.* at 251. Because the DOC

unconstitutionally refused to apply those time credits, he urged, his continued imprisonment was unlawful and redressable on habeas. *Id.* On the merits, this Court sided with the DOC. *Id.* at 260.

But our reasoning was more important than the result. For *Jones* to make any sense, the petitioner's constitutional arguments must have mattered to the availability of habeas relief. If they did not and subsection 17-4(2) categorically withdraws the writ from lawfully imprisoned defendants, then this Court had no need to consider the constitutional merits. But we did—and thoroughly, too. *Id.* at 255 (deciding case by "only" considering "whether DOC's interpretation that Jones's good time, gain time, and merit time credits were not awarded to him for purposes of unconditional release is statutorily and constitutionally permissible"). *Jones* thus rests on an implicit premise key to this case: A habeas petitioner may attack his continued imprisonment on constitutional grounds, even if his original sentence were lawful.

Our precedent has (or had) good company—other state courts have construed their habeas statutes the same way. New York's highest court, for instance, has blessed habeas challenges to "any *further* restraint *in excess* of that permitted by the judgment or constitutional guarantees." *People ex rel. Brown v. Johnston*, 174 N.E.2d 725, 726 (N.Y. 1961) (cleaned up). Other states have followed suit. *See, e.g., Beacham v. Walker*, 231 Ill. 2d 51, 58 (2008); *Penrod v. Cupp*, 581 P.2d 934, 935 (Or. 1978); *State ex rel. Cole v. Tahash*, 129 N.W.2d 903, 907 (Minn. 1964). And especially

relevant here, Colorado's Supreme Court—interpreting a statute nearly identical to ours—has held that "any restriction in excess of legal restraint that substantially infringes on basic rights may be remedied through habeas corpus." *Marshall v. Kort*, 690 P.2d 219, 221–22 (Colo. 1984) (en banc), *overruled in part by Jacobs v. Carmel*, 869 P.2d 211 (Colo. 1994) (en banc); *see also Fahie v. Government of the Virgin Islands*, 73 V.I. 443, 449 (2020) ("[T]he statute specifically provides that a writ may be issued '[w]hen the imprisonment was at first lawful, yet by some act, omission, or event which has taken place afterwards, the party has become entitled to a discharge.' Discovering evidence that was not previously available is by definition 'some act, omission, or event,' and if that evidence is sufficiently conclusive as to a prisoner's innocence it may make the prisoner 'entitled to a discharge.' ").

**D. History**

The majority pairs its lopsided textual analysis with an equally myopic recitation of history. It flags two stops along habeas' historical journey, noting statutes passed in 1836 and 1854. Both enactments withheld habeas relief to prisoners held under final judgments, as did "the common law and the English Habeas Corpus Act of 1679." But to hear the majority tell it, history ended there. It ignores later developments expanding the writ and extending habeas to petitioners held under a valid criminal judgment. Viewed in its entirety, the historical arc of habeas confirms its embrace of claimants like Mr. Daw.

Habeas corpus has a long pedigree, tracing "its origin long prior to Magna

Charta." *In re Holley*, 154 N.C. at 168. Pollinated by the common law, North Carolina embraced the "great writ" as the "most important, perhaps, in our system of government." *Id.* As in England, habeas empowered courts to examine whether a person was "wrongfully imprisoned or restrained of his liberty" and release him "if imprisoned against law." *In re Bryan*, 60 N.C. 1, 45 (1863).

But though a key legal protection, habeas was an imprecise remedy in early North Carolina. Our first Declaration of Rights, for instance, referenced the writ obliquely, preserving the right of "every Freeman restrained of his Liberty[,] . . . to inquire into the Lawfulness thereof, and to remove the same if unlawful." N.C. Const. of 1776, Declaration of Rights, § XIII. Instead, habeas was a creature of statute—and a diminutive creature at that. The 1854 Revised Code, as the majority recounts, gave the writ a narrow berth, instructing that a petitioner "condemned by judgment given against him" shall "be presently remanded, where he shall remain until discharged in due course of law." N.C. Revised Code of 1854, ch. 31, § 111.

But in 1868, two legal developments cemented the writ's "prominent place in our organic law." *In re Holley*, 154 N.C. at 168. For one, North Carolina adopted a new constitution that expressly guaranteed habeas. *See* N.C. Const. of 1868, art. I, § 21. That same year, the General Assembly chiseled that constitutional guarantee into statutes, adopting a package of habeas provisions that included what is now sections 17-4 and 17-33. *See* Proceedings in Habeas Corpus, ch. 116, §§ 19, 20, 1868–'69 N.C. Public Laws 291, 297–98. The majority gestures to the 1868 expansion of habeas,

conceding that the legislature "enacted a more comprehensive statutory scheme." But it ignores *how* the General Assembly enlarged the writ's scope.

Unlike the 1854 Code, the 1868 provisions allowed a prisoner to seek habeas relief when an unforeseen "act, omission or event" entitled him to discharge, even when the original confinement was lawful. *See* Proceedings in Habeas Corpus, ch. 116, § 20(2), 1868–'69 N.C. Public Laws 291, 298. So though the pre-Civil War statute aligned with the majority's reading, the legislature overhauled that regime, extending habeas where it was before foreclosed. As this Court recently explained, the changes "ma[de] to a statute's text over time provide evidence of the statute's intended meaning." *See Wynn v. Frederick*, 385 N.C. 576, 582 (2023). And here, those historical changes point in Mr. Daw's favor—by breaking from earlier provisions, the General Assembly consciously rejected the cramped vision of habeas available at common law and adopted by the majority today. In broader view, too, the legislature adopted section 17-4 and section 17-33 at the same time, betokening those provisions' congruence and independent force. Weighing in on that point, the Drafting Committee confirmed that each part of the newly enacted habeas statutes was intended "to fit in and harmonize with the other[s]" as a "consistent whole." N.C. Code Civ. P. of 1968, Second Report of the Code Commissioners.

Also important is the legislature's tacit approval of habeas claims like Mr. Daw's. This Court invoked subsection 17-33(2) in 1954, endorsing habeas relief "notwithstanding [subsection] 17-4(2)." *In re Harris*, 241 N.C. at 180. The Court of

Appeals took up that torch in 1976—in a string of five cases, it has blessed section 17-33 as an exception to subsection 17-4(2). If the General Assembly disagreed with that reading, it has had seventy years to correct our precedent and forty-eight for the Court of Appeals'. It has not. *Cf. In re G.B.,* 377 N.C. 106, 118 (2021) (pointing to "decades" old precedent and emphasizing that "[a]t no point during th[e] interim time period . . . has the Legislature chosen to amend the pertinent statute to alter our holding").

This is not because the General Assembly ignored habeas altogether. In 1967—over a decade after we endorsed a claim under subsection 17-33(2)—the legislature modified the habeas provisions to remove child-custody cases. *See* An Act to Rewrite the Statutes Relating to Custody and Support of Minor Children, ch. 1153, § 1, 1967 N.C. Sess. Laws 1772, 1772. And over a decade after that amendment, the General Assembly replaced other post-conviction filings with motions for appropriate relief, but expressly preserved recourse through habeas. *See* N.C.G.S. § 15A-1411(c) (1978) ("The availability of relief by motion for appropriate relief is not a bar to relief by writ of habeas corpus."). Reading subsection 17-4(2) to engulf section 17-33 would thus rewrite statutes that the General Assembly has left untouched.

### III. Section 17-33 allows Mr. Daw to test the constitutionality of his continued incarceration during COVID-19.

As a matter of statutory interpretation, this case should be straightforward. Though subection 17-4(2) forecloses habeas petitions that simply relitigate the merits of a conviction or sentence, section 17-33 carves a different lane for a different type of

claim. Despite the former's "general prohibition," the latter provides "specific permission," *see* Scalia & Garner, at 183, allowing a discrete class of petitioner to test the "legal cause" for their "continu[ed]" imprisonment, N.C.G.S. § 17-33. Harmonizing subsection 17-4(2) with section 17-33 honors the legislature's chosen words, respects the context and interrelation of the habeas provisions, coheres with precedent, and tracks habeas' statutory evolution. On a deeper level, too, it aligns with the purpose of the writ and its role in our constitutional scheme.

The "principal object" of habeas is to free "a party from illegal restraint." *State v. Miller,* 97 N.C. 451, 454 (1887). Above all, it is "an adaptable remedy," not a "static, narrow, formalistic" device. *Boumedienne v. Bush*, 553 U.S. 723, 779–80 (2008) (quoting *Jones v. Cunningham*, 371 U. S. 236, 243 (1963)). From its roots in medieval England, the writ "has grown to achieve its grand purpose" as a tool against "all manner of illegal confinement." *Id.* (quoting 3 William Blackstone, Commentaries *131). Consistent with that historical sweep, habeas serves to "effect discharge from any confinement contrary to the Constitution or fundamental law, even though imposed pursuant to conviction by a court of competent jurisdiction." *Preiser v. Rodriguez,* 411 U.S. 475, 485 (1973). A prisoner placed "under additional and unconstitutional restraints during his lawful custody" may "arguabl[y]" invoke habeas to "remove the restraints making the custody illegal." *Id.* at 499.

In my view, a duly imprisoned defendant may seek habeas relief when the state violates his constitutional rights and exacts restraint in "excess" of the sentence

imposed. *In re Holley*, 154 N.C. at 168. As this Court has recognized, "basic constitutional rights adhere inside as well as outside the prison walls." *State v. Primes*, 314 N.C. 202, 208 (1985). Confinement is thus unlawful—and so habeas available—when a person is "imprisoned contrary to the law of the land." *In re Holley*, 154 N.C. at 168; *see also Phillips*, 185 N.C. at 619 (holding that a habeas petitioner's "sentence [wa]s void, being in contravention of [his] constitutional rights"). That is, when a constitutional violation is layered atop an otherwise valid detention, that extra sanction pushes the confinement into impermissible terrain. *See id.* Or, to use the language of section 17-33, an "act, omission or event" has converted the lawful "original imprisonment" into one without "legal cause." *See* N.C.G.S. § 17-33; *cf. Goble v. Bounds*, 281 N.C. 307, 311 (1972) ("[A] prisoner takes with him into the prison certain rights which may not be denied him.").

That is because a "conviction and incarceration deprive [a defendant] only of such liberties as the law has ordained he shall suffer for his transgressions." *Coffin v. Reichard*, 143 F.2d 443, 445 (6th Cir. 1944) (per curiam). The Constitution itself delimits any incursions on inmates' liberty interests, as "persons sentenced to prison are not stripped of all constitutional rights at the prison gate." *Primes*, 314 N.C. at 208; *see also Johnston*, 174 N.E.2d at 726 (cleaned up) (affirming that a defendant "validly convicted and placed under the jurisdiction of the Department of Correction" is not "divested of all rights and unalterably abandoned and forgotten by the remainder of society"). By necessity, then, the "fact that a person is legally in prison

does not prevent the use of habeas corpus to protect his other inherent rights." *Coffin*, 143 F.2d at 445. A defendant "in lawful custody" may invoke the writ when the government violates "some right to which he is lawfully entitled even in his confinement," such as the "right to personal security against unlawful invasion." *Id.* By breaching those constitutional protections, the state makes "imprisonment more burdensome than the law allows or curtails [a defendant's] liberty to a greater extent than the law permits." *Id.* (cleaned up). In other words, the government exacts "*further* restraint *in excess* of that permitted by the judgment or constitutional guarantees." *Johnston*, 174 N.E.2d at 726. Habeas is thus available to fulfill its traditional role: "alleviat[ing] the oppression of unlawful imprisonment," *id.*, and redressing "[a]ny unlawful restraint of personal liberty," *Coffin*, 143 F.2d at 445.

Those principles apply to Mr. Daw's claim, understanding that he may not have been able to prove the alleged facts. He does not dispute his conviction or sentence—by all accounts, his trial was fair and his original punishment just. Instead, he argues that COVID-19 changed the nature of his imprisonment, varying the sentence served from the one authorized by law. His petition highlights the unique danger of COVID-19 for prisoners with respiratory conditions, a danger that threated to turn a term of years into a death sentence. And when Mr. Daw sought release, that risk was real. In June 2020, the prisons were overcrowded and the state's policies inadequate. Because of his medical history and the state's meager response to the pandemic, Mr. Daw urged that his continued imprisonment during

COVID-19 was cruel and unusual punishment.

Mr. Daw was sentenced to prison, not COVID-19. Though incarceration carries implicit risks, avoidable exposure to a dangerous virus is not one of them. *See Helling v. McKinney,* 509 U.S. 25, 33 (1993). It is "cruel and unusual punishment to hold convicted criminals in unsafe conditions." *Youngberg v. Romeo*, 457 U. S. 307, 315–16 (1982). For that reason, the state violates the Eighth Amendment by "ignor[ing] a condition of confinement that is sure or very likely to cause serious illness and needless suffering," *Helling,* 509 U.S. at 33. When the state defies that constitutional safeguard, it exacts "*further* restraint *in excess* of that permitted by the judgment or constitutional guarantees." *Johnston*, 9 N.Y.2d at 485. Applied here, if the state deliberately ignored Mr. Daw's exposure to a "serious, communicable disease," then it inflicted "needless suffering" in violation of his rights and beyond his lawful sentence. *Helling,* 509 U.S. at 31–33. On habeas, then, section 17-33 allowed Mr. Daw to test the constitutionality of his continued confinement under the state's COVID-19 policies. Rather than attacking an error in his original conviction or sentence, he sought relief because a later event—his alleged "compelled exposure" to a uniquely dangerous virus—was an "unnecessary and wanton infliction of pain" beyond his lawful punishment. *See Estelle v. Gamble*, 429 U.S. 97, 104–05 (1976) (explaining that the state's "deliberate indifference to serious medical needs of prisoners constitutes the unnecessary and wanton infliction of pain proscribed by the Eighth Amendment" (cleaned up)).

## IV.    Conclusion

I would dismiss this case as moot rather than weaponizing a long-dead controversy to bar habeas courts from redressing unconstitutional imprisonment. On the merits, I would apply the statutes the legislature enacted, adhere to our precedent, and allow Mr. Daw to file and litigate his habeas petition under section 17-33. The majority effectively erases that provision, replacing the legislature's words with the pre-Civil War version of the law. All the normal tools of statutory interpretation—language, context, precedent, and history—rebuff the majority's stilted reading. Today's holding is the latest effort to turn the Great Writ into a paper tiger. It extinguishes an important safeguard of fundamental freedoms. With respect, I dissent.

Justice RIGGS dissenting.

I agree with Justice Earls' analysis of the mootness exception issue and write separately to emphasize how ill-advised it is for this Court to take cases where our decision has no practical effect and the matter needs no prompt resolution. Indeed, the majority gives such short shrift to its mootness exception analysis that it becomes clear that the majority was determined to issue a decision significantly altering habeas law in this state, regardless of the propriety of the case utilized to do so. This kind of ends-driven jurisprudence is antithetical to the principle of judicial restraint. Making dramatic change to our law via a case in which the issue is no longer justiciable only confirms that this Court believes it is in a law-making role and elevates judicial activism over judicial restraint.

While defendant Philip Brandon Daw raised important questions about the State's responsibility to ensure the physical safety of those confined during a global pandemic, Mr. Daw's situation no longer required this Court to act. Mr. Daw, who suffers from asthma, was incarcerated at Harnett Correctional Institution (HCI) during the summer of 2020—the height of the Coronavirus Pandemic. Due to his chronic lung disease and the documented heightened susceptibility of incarcerated people to the coronavirus, Mr. Daw sought habeas relief. In particular, Mr. Daw's petition argued that the conditions at HCI were "cruel and unusual" and thus, violated the Eighth Amendment to the United States Constitution. The trial court rejected his argument. Mr. Daw then sought review from the Court of Appeals. While

that appeal was pending, the North Carolina Department of Public Safety, acting under N.C.G.S. § 148-4, expanded the qualifications for participation in its Extended Limits of Confinement Program. Among the criteria were having "a 2020 or 2021 release date and underlying health conditions deemed by CDC that increase a person's risk of severe illness from COVID-19." Because Mr. Daw met those criteria, he was subsequently released.

With Mr. Daw no longer incarcerated at HCI, his writ of habeas corpus now seeks no actual relief. Thus, because this case was moot and did not fall under the public interest exception, I dissent.[1]

## MOOTNESS & THE PUBLIC INTEREST EXCEPTION

The general rule is simple: Our courts "do not decide moot cases." *Chavez v. McFadden*, 374 N.C. 458, 467 (2020); *see also State ex rel. Martin v. Sloan*, 69 N.C. 128, 128 (1873) (opining that when "neither party has any interest in the case except as to cost[,]" this Court "[is] not in the habit of deciding the case"). Mootness is a creature of "judicial restraint" rather than "a lack of jurisdiction," *Chavez*, 374 N.C. at 467 (quoting *Cape Fear River Watch v. N.C. Env't Mgmt. Comm'n*, 368 N.C. 92, 100 (2015)), and counsels us to avoid "second guess[ing] the actions of the legislative and executive branches," thereby respecting the separation of powers, *Cmty. Success Initiative v. Moore*, 384 N.C. 194, 206–07 (2023). Our "courts will not entertain or

---

[1] I agree with Justice Earls that no other exception applies but do not address those exceptions in detail because no other exceptions have been addressed in this case.

proceed with a cause merely to determine abstract propositions of law." *In re Peoples*, 296 N.C. 109, 147 (1978). Moreover, by only sticking to "live controversies, we 'ensur[e] concrete adverseness that sharpens the presentation of issues.'" *Walker v. Wake Cnty. Sheriff's Dep't*, 385 N.C. 300, 304 (2023) (order) (Earls, J., concurring in part and dissenting in part) (alteration in original) (quoting *Comm. to Elect Dan Forest v. Emps. Pol. Action Comm.*, 376 N.C. 558, 595 (2021)).

But, as with most rules in law and life, there are exceptions. In few words, the majority here says the public interest exception applies. This Court first acknowledged the public interest exception in *North Carolina State Bar v. Randolph*, 325 N.C. 699 (1989) (per curiam), which arose out of an alleged Rules of Professional Conduct violation by a probate attorney who paid himself attorney's fees using the estate's funds. *Id.* at 700. The trial court ordered that the State Bar be added as a party to a lawsuit brought by the estate's administratrix and then ordered the State Bar to dismiss the grievance filed with it against the probate attorney. *Id.* at 701. The State Bar disputed the trial court's authority to take these actions. *Id.* But because both the trial court and the State Bar exonerated the attorney of any wrongdoing, *id.* at 700, on appeal the defendant probate attorney argued that the case was moot, *id.* at 701. This Court only briefly addressed the mootness question, declaring that it had plenary discretion to "consider a question that involves a matter of public interest, is of general importance, and deserves prompt resolution." *Id.* This Court applied the exception and reversed the trial court because the Court

"conclude[d] that a jurisdictional dispute between the superior court and the North Carolina State Bar presents such a question." *Id.*

Since *Randolph*, this Court has considered the public interest exception at least three times, often with little explication of its use of the criteria. *See Granville Cnty. Bd. of Comm'rs v. N.C. Hazardous Waste Comm'n*, 329 N.C. 615 (1991); *Cape Fear*, 368 N.C. 92; *Chavez*, 374 N.C. 458. First, in *Granville*, the County sought to enjoin the North Carolina Hazardous Waste Management Commission from proceeding with designating a site for a newly planned hazardous waste treatment facility. *Granville*, 329 N.C. at 616–17. During this litigation, the Commission halted consideration of the site in controversy, and the State was ultimately "expelled" from further participation in the regional multistate agreement, requiring North Carolina to construct and operate a hazardous waste treatment facility. *Id.* at 621–22. Given these developments, the Court concluded that the case was moot. *Id.* at 622. Nevertheless, the Court reached the merits of the dispute "[b]ecause the process of siting hazard waste facilities involves the public interest and deserves prompt resolution in view of its general importance." *Id.* at 622–23.

Then, in *Cape Fear River Watch*, this Court was tasked with determining whether a trial court erred in partially reversing an Environmental Management Commission declaratory ruling. That ruling addressed the application of groundwater protection rules to coal ash lagoons that received operating permits before a certain date. 368 N.C. at 93. Shortly after the trial court's order, the General

Assembly enacted N.C.G.S. § 143-215.1(k), which subjected all coal ash lagoons to the Commission's rule, irrespective of the date the lagoon was first permitted. *Id.* at 98. The Court determined that this new legislation rendered the case moot. *Id.* at 98–100. The Court further refused to invoke the public interest exception because, although "the appropriate response to the environmental issues associated with the operation of coal ash lagoons is clearly a matter of significant public interest," there was no "indication that any decision [the Court] might make . . . would have any practical impact." *Id.* at 100; *see also id.* at 451 ("[W]e believe that we should refrain from issuing what amounts to an advisory opinion . . . .").

Most recently in *Chavez*, this Court addressed whether state judges had the authority to grant habeas relief for individuals held in custody pursuant to an agreement under section 287(g) of the Immigration and Nationality Act. 374 N.C. at 460–61. Two habeas petitioners challenged their custody in the Mecklenburg County Jail and the trial court ordered that they be immediately brought for a habeas hearing, but the Sheriff refused to produce either petitioner to the trial court. *Id.* at 462. That court then ruled in favor of the petitioners and ordered that they be discharged from custody, but the Sheriff instead delivered them to federal custody. *Id.* at 462–63. Because both petitioners were no longer detained at Mecklenburg County Jail, the parties conceded that the case was moot. *Id.* at 468. Still, this Court invoked the public interest exception and decided the case because (1) "lawful and unlawful immigration have become the subject of much debate in North Carolina in

recent years" and (2) "several law enforcement agencies across our State continue to operate pursuant to [section] 287(g) agreements." *Id.* The *Chavez* Court's decision to hear the case boiled down to "the likelihood that [similar] issues . . . [would] continue to arise in the future." *Id.*

In light of this precedent on the public interest exception, I think it is clear that the majority's logic is flawed. The majority begins its brief analysis with factors this Court has never considered in deciding whether the public interest exception applies. The majority expresses concern with the scope of the opinion below, describing it as "expansive" and "not limited to the COVID context" because, despite affirming the trial court's denial of the petition, the Court of Appeals did not hold as this Court does today that Mr. Daw was not entitled to bring the petition. Even assuming this concern somehow speaks to a likelihood that the question will reoccur, which is a stretch, the majority misses the mark because under the public interest exception, this Court focuses on whether similar issues will arise based on similar facts. *See Chavez*, 374 N.C. at 468 (considering whether there is a "likelihood that issues similar to those that have been debated *by the parties to this case* will continue to arise in the future" (emphasis added)). Moreover, the majority's characterization of the scope of the decision is questionable: Just because the Court of Appeals interpreted a law of general applicability does not mean that court issued an expansive opinion unrestricted to Mr. Daw's specific set of facts. *See State v. Daw*, 277 N.C. App. 240, 261 (2021) (denying any relief to Mr. Daw under the habeas

statute based on the petition's evidentiary failures, thus not expanding the applicability of the habeas statute). And regardless, such a consideration is again not relevant to our analysis under our mootness exception precedent.

The majority also reasoned that the public interest exception is necessarily invoked because the opinion below now binds the Court of Appeals and trial courts and the decision below relies on prior Court of Appeals cases. But the majority is off target again. Analysis of the mootness factors and exceptions under this Court's precedent actually supports an opposite result when, as here, the issue presented is mooted by an intervening, unilateral act by one party. *State ex rel. Utils. Comm'n v. S. Bell Tel. & Tel. Co.*, 289 N.C. 286, 288 (1976). In other words, because of Mr. Daw's release from HCI—an intervening event by the State—"a dispute between the parties to this appeal no longer exists." *Id.* Even using the majority's own logic about precedential effect and reliance on prior decisions, the majority should have, at most, limited itself to dismissing this appeal and vacating the judgment below.

Finally, the majority ends its brief analysis of the public interest exception on an ironic note: by noting habeas corpus's "essential function of providing relief for those unlawfully restrained of their liberty" as a justification for why the majority should consider a moot case with no immediate or practical implications. To be clear, this decision eviscerates that function for state post-conviction relief. And in order to achieve this result, the majority had to misapply the public interest exception test to even decide this case.

Specifically, while public health and habeas law generally are matters of public interest, Mr. Daw's specific case no longer had any public interest tied to it. Mr. Daw's habeas petition related to *his* chronic medical condition while he was at HCI during the height of the Coronavirus Pandemic, which has since been significantly mitigated. This situation is markedly different than that in *Chavez*, in which this Court noted that "lawful and unlawful immigration have become the subject of much debate in North Carolina in recent years" and thus ruled that the case concerned the public interest. *Chavez*, 374 N.C. at 468. Today, with the availability of vaccines and better understanding of how the disease is spread, the perception of the physical consequences of confinement of people with certain underlying health conditions and their heightened susceptibility to the coronavirus is different and less concerning when compared with the situation in the summer of 2020.

This case also does not require prompt resolution, which further weighs against invoking the public interest exception. Mr. Daw is no longer in the State's custody at HCI and thus, is no longer eligible for habeas relief. Mr. Daw's exact situation is unlikely to occur again given that the Coronavirus Pandemic has abated as a result of the development of vaccines and a better understanding of how to prevent transmission. Or, at least, fears of future public health crises and the effect of pre-existing conditions on susceptibility to future viruses are too non-specific and unsupported to justify invocation of the exception on this record. This case also stands in stark contrast to *Chavez*, in which the Court was particularly concerned

with the great likelihood that a similar case would arise in the future because "several law enforcement agencies across our State continue to operate pursuant to § 287(g) agreements." *Id.* at 468.

There is also no need for prompt resolution of this case for the exact reason the majority points out—our General Assembly structured habeas relief by enacting N.C.G.S. §§ 17-4(2) and 17-33(2) over a century ago and has not significantly altered that relief, insofar as it relates to the case here today, since then. *See Cape Fear*, 368 N.C. at 100 (refusing to invoke the public interest exception because the General Assembly already enacted legislation addressing the parties' issue). The majority highlights that the opinion below relied on prior decisions interpreting sections 17-4(2) and 17-33(2), *see, e.g.*, *State v. Leach*, 227 N.C. App. 399 (2013); *Hoffman v. Edwards*, 48 N.C. App. 559 (1980); *In re Stevens*, 28 N.C. App. 471 (1976), but in the nearly fifty years that those cases have been on the books, the General Assembly has not acted contrary to those decisions, *see Connette ex rel. Gullatte v. Charlotte-Mecklenburg Hosp. Auth.*, 382 N.C. 57, 80 (2022) (Barringer, J., dissenting) ("Of course, the legislature, which is not bound by stare decisis, could have at any time in the last ninety years enacted a different rule . . . ."). As amici note, our General Assembly's "inactivity in the face of the [judiciary's] repeated pronouncements [on this issue] can only be interpreted as acquiescence by, and implicit approval from, that body." *In re T.R.P.*, 360 N.C. 588, 594 (2006) (second alteration in original) (quoting *Rowan Cnty. Bd. of Educ. v. U.S. Gypsum Co.*, 332 N.C. 1, 9 (1992)); *see also*

*State v. Steen*, 376 N.C. 469, 483 (2020) (affirming the decision of the Court of Appeals because, in part, "the General Assembly ha[d] not taken any action tending to suggest" disagreement with prior appellate decisions interpreting the Statute at issue). If our legislature sees no need to disrupt a liberal construction of a habeas statute—statutes freeing "those unlawfully restrained of their liberty"—I see no need for us to claw back that reading.

Although habeas undoubtedly is of "general importance," it does not follow that a mooted habeas issue automatically qualifies for review under the public interest exception. *See Chavez*, 374 N.C. at 468–69 (only invoking the public interest exception at the intersection of contentious disagreement over the application of federal immigration law in the habeas context rather than on the importance of habeas alone); *In re Popp*, 298 N.E.2d 529, 531 (Ohio 1973) (refusing to invoke the public interest exception in a habeas case in that "there [was] no confinement" and "[t]here [were] remedies to attack the collateral issues raised by petitioner, other than this high prerogative writ"), *syllabus abrogated by In re Klepper*, 361 N.E.2d 427 (Ohio 1977) (per curiam). As other jurisdictions have acknowledged, if matters of legal importance were per se exceptions to mootness, the exception would swallow the rule. *See, e.g., Commonwealth Edison Co. v. Ill. Com. Comm'n*, 51 N.E.3d 788, 791 (Ill. 2016) ("The public interest exception is narrowly construed and requires a clear showing of each of its criteria. . . . Indeed, the public interest exception is invoked only on 'rare occasions' when there is an extraordinary degree of public

interest and concern." (internal citations omitted)).

Thus, I believe the majority improperly invoked the public interest exception to mootness to reach the merits of this case. I agree with Justice Earls that it is inappropriate to rewrite habeas law the way the majority has here. Without making any representations regarding the likelihood of success of Mr. Daw's petition, were the case not moot, I would agree that he is entitled to petition for habeas relief and be heard on the merits of his claims.